MICHAEL MULLINS v. A. BROWN AND THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY.

BANK CHECK—*When Payment of Debt, When Not.* A check on a bank is not *prima facie* evidence of the payment of the original debt; and clearly a check drawn in favor of the debtor's agent is not *prima facie* evidence of the payment of the debt to the creditor, even if the creditor assents that the check shall be so drawn. In order that a check on a bank shall be payment of the original debt, it must be agreed by the parties that it shall be such payment and be taken by the creditor as payment.

*Error from Pawnee District Court.*

ACTION by *Brown* against *The Railroad Company*, to recover the value of certain broom corn. *Mullins* and other persons were made parties, as requested by the defendant company. *Mullins* answered, setting up his claim to the subject-matter of the controversy. Trial at the November Term, 1883, when the jury rendered a general verdict for the plaintiff for $550, and also made special findings. The court overruled *Mullins's* motion for judgment in his favor upon the special findings, and also overruled his motion for a new trial. Judgment was rendered upon the general verdict for plaintiff. To reverse this judgment, *Mullins* brings the case to this court. The material facts are stated in the opinion.

*Whiteside & Hutchinson*, for plaintiff in error.

*N. Adams*, and *J. M. Van Winkle*, for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: The controversy in this case exists be-
tween Michael Mullins and Alonzo Brown, although others
were made parties in the court below and are now parties in
this court. The controversy is with regard to the ownership
of certain broom corn owned by Michael Mullins on the
morning of November 8, 1882, but sold conditionally on that
morning by Mullins to Lee Boyles. Mullins's contract with
Boyles was, that Mullins should furnish to Boyles on that
day a car-load of broom corn at his (Mullins's) elevator or
warehouse, in the city of Larned, Pawnee county, Kansas, for
$60 per ton; but the broom corn was to remain the property
of Mullins, who was not to part with his ownership or his
right to the possession thereof until the same was paid for.
Boyles at the time was the agent of Brown, and purchased
the broom corn for Brown; but Mullins had no knowledge
of such agency, and in fact supposed he was selling the broom
corn to Boyles. At the instance of Boyles, the railroad com-
pany placed one of its cars on a switch in front of Mullins's
elevator, and Mullins filled the car with broom corn; and
while the car was still in front of Mullins's elevator, and still
open, and while the gang-plank was still extending from the
elevator to the car, but in the absence of Mullins and of all
his agents and employés, Boyles and Brown examined the car
and the broom corn, and Brown agreed with Boyles to accept
the broom corn. Shortly afterward, while Boyles and Mul-
lins were passing along the street in front of Brown's place
of business — a feed store — Boyles went into Brown's place
of business and procured a check to be drawn to himself by
Brown, on the First National Bank of Larned, Kansas, for
the amount due to himself and to Mullins for the broom
corn. Mullins was to receive $60 per ton for the broom corn;
Brown was to pay Boyles $2.50 per ton for purchasing the
same; and Boyles in some way managed to get $5 more per
ton from Brown, as profits, making the total amount to be
paid by Brown to Mullins and Boyles for the broom corn

$67.50 per ton. This check to Boyles covered the entire amount which Brown was to pay for the broom corn, to wit, $67.50 per ton, and in the aggregate amounted to $446.10. Brown testified that Mullins was present at the time this check was drawn, but Mullins testified that he was not present, but that he remained in the street in front of Brown's place of business and did not hear any of the conversation which occurred at the time between Brown and Boyles, and that he was still ignorant of the fact that Boyles was acting as the agent of Brown when this check was drawn. Brown's entire testimony upon this subject is as follows:

### DIRECT EXAMINATION.

"After dinner Mr. Boyles and Mr. Mullins came to my office, and stood before the desk. Mr. Boyles said, 'We have the weights for that corn,' and handed to me the tickets. We examined the tickets and figured the weights, Mr. Mullins looking on. Mr. Boyles was my agent. When we figured up I gave Mr. Boyles my check for $446.10 on the First National Bank of Larned, where I had my deposit. I gave the check to pay for the corn and for Mr. Boyles to get his pay; I was to pay him $2.50 per ton. There were —— tons of corn. I said, 'Who shall I make the check to?' They consulted aside a moment, and then Mr. Boyles said, 'You may as well make it to me.' Mullins nodded assent. They took the check and went out. I had enough money at the bank to pay it, and it was charged to my account in the bank. I never got the money on it."

### CROSS-EXAMINATION.

"Q. You gave this check to your agent to go to the bank to pay Mullins, did you?

"A. Yes, sir, to pay Mr. Boyles, my agent.

"Q. Did he pay Mullins?

"A. No, the bank kept the check.

"Q. You afterward demanded the money of the bank, did you?

"A. Yes, sir.

"Q. How many times?

"A. Mr. Rush [president of the bank] and I lived in the same direction, and I spoke to him several times about it."

The principal part of Mullins's testimony upon this subject is as follows:

"We walked on down the street together. When we came to Brown's feed store, Boyles went in there. I stayed outside. I think at one time I put my foot on the door-step. Brown and Boyles were talking about something—I did not know what, at the time. Pretty soon Boyles came out with a check in his hand, and says 'Come on.' I saw the check was on the First National Bank. We went to the bank together."

Mullins further testified in substance that he did not go into Brown's office or feed store; that he did not hear any of the conversation between Brown and Boyles; that he did not know beforehand that Boyles expected to get a check, and that he did not know anything about the check until Boyles brought it out of Brown's office after it had been drawn. Boyles did not testify as to whether Mullins was present when the check was drawn, or not. He simply testified that Brown gave the check to him and payable to his order. Mullins and Boyles went immediately to the bank, which was just across the street from Brown's office, and Boyles presented the check to one of the officers of the bank, but, the check being informal, Boyles took it back to Brown, who made it formal, and Boyles then returned to the bank, where the check was again presented to one of the officers of the bank, who took it and gave Boyles credit therefor on his (Boyles's) account, but refused to pay Boyles any money thereon, as he claimed that Boyles had overdrawn his account and was owing the bank more than that amount. Mullins then told Boyles that he would not let him have the broom corn, as by their agreement the same was to remain the property of Mullins until it was paid for. Mullins immediately went to his elevator and ordered that the broom corn be unloaded and placed back in his elevator, which was immediately done. However, while the broom corn was being unloaded, Brown appeared and claimed the same, but Mullins told him that no one could have it until it was paid for. Brown then went to the office of the Atchison, Topeka & Santa Fé railroad company and demanded of the company's agent at that place a bill of lading for the

broom corn, but Mullins, who had followed Brown and who was also present, objected, and stated that the broom corn had not been paid for, and that it still belonged to him. Brown's agents, however, Martin D. Bennyworth and Boyles, told the agent of the railroad company that the broom corn had been paid for and that it belonged to Brown, and the agent of the railroad company then issued to Brown a bill of lading for the broom corn. All this occurred on November 8, 1882. Mullins testified at the trial, among other things, as follows:

"I unloaded every bale in the car, 42 bales, back into the house again. That afternoon Brown came to me and said that he would *buy the corn* of me and pay me for it before he loaded it into the car. I was afraid he would not pay for it."

This testimony of Mullins was not disputed by Brown. On the next day Mullins loaded the broom corn into another car of the railroad company, and the railroad company transported the same to Kansas City and there sold it and retained the money. J. W. Rush, the president of the First National Bank of Larned, testified among other things as follows:

"After I placed the check to Mr. Boyles's credit, Mr. Brown demanded the money, saying *it was his*, at the bank, and begged me for it. He asked me several times. Mr. Mullins never did ask for it."

Afterward, Brown sued the railroad company for the value of the broom corn, but the railroad company set up all the facts, stating that Mullins and other parties claimed to own the broom corn and claimed the money, and asked that they be made parties to the suit, and stating that the company was ready and willing to pay the money to whomsoever the court might adjudge that it belonged. Mullins and others were made parties, as requested by the railroad company, and Mullins answered, setting up his claim to the money; and this constitutes the present controversy. It was agreed between all the parties that the broom corn was worth $550. A trial was had before the court and a jury, and the jury rendered a general verdict in favor of the plaintiff, and assessed his damages at $550, and also made special findings. The de-

fendant, Mullins, then moved the court for judgment in his favor upon the special findings, and also moved the court for a new trial, which motions were overruled by the court, and judgment was rendered in accordance with the general verdict; and to reverse this judgment the defendant, Mullins, brings the case to this court.

The main question involved in this case is, whether the check from Brown to Boyles paid Mullins for the broom corn, or not. The court below instructed the jury in substance that *prima facie* it did. In other words, the court below instructed the jury that "payment by check on a bank is *prima facie* evidence of payment, but subject to be rebutted by proof that such check did not amount to payment, by want of funds in the bank to pay it when given, or for other reason." This instruction is unquestionably erroneous. A check from Brown to his agent, Boyles, cannot be presumed, *prima facie* or otherwise, to be a payment to Mullins. Even if the check had been given to Mullins, it would not have been *prima facie* evidence of the payment of the debt. (Edwards on Bills, Notes and Negotiable Instruments, § 277; *Kermeyer v. Newby*, 14 Kas. 164; *McCoy v. Hazlett*, 14 id. 430; *Shepard v. Allen*, 16 id. 182, 184, bottom of page; *Medberry v. Soper*, 17 id. 369, 375.) And we do not think that the evidence shows any payment to Mullins: (1) There was no delivery of the broom corn by Mullins to either Brown or Boyles; (2) there was no actual payment for the broom corn to Mullins, either by check or in money; (3) there was no actual payment in money to any one; (4) the check was not drawn to Mullins, nor indorsed to him, nor did he present it to the bank for payment; nor did he ever ask for any payment or money or other thing thereon, and he never received anything thereon; (5) the check was in fact drawn to Brown's agent, Boyles, and he at first demanded payment thereon; but afterward Brown himself claimed the money and demanded payment of the same of the bank, and at several different times afterward demanded the payment of the same of the bank; (6) Mullins never understood or supposed that the transaction had between himself and Brown and

Boyles amounted to a payment to him for his broom corn; (7) and from the various transactions it is hard to believe that either Brown or Boyles ever believed that such transactions amounted to a payment to Mullins for his broom corn; for Brown himself, after the check had been drawn, after the bank had refused to pay it, after Mullins had unloaded the corn and placed it in his own building, offered to purchase the corn from Mullins and to pay him for the same before it should be again loaded into another car.

Some of the special findings of the jury are not sustained by the evidence. Some of them were evidently induced by the above-mentioned misdirection of the court; but one or two of them can hardly be accounted for. The jury probably found that the broom corn was paid for, for the reason that the court instructed them in effect that the check was *prima facie* evidence of payment for the same; and probably the jury did not think that Mullins proved that the check was *not* a payment for the same. Of course, if Mullins had agreed with Brown that the check should be taken and received as a payment for his broom corn, the agreement would be valid and binding, and Mullins could not say that he did not receive payment for his broom corn. But it cannot be said from the evidence and as a matter of law, that any such agreement was in fact made. And it does not devolve upon Mullins to prove the non-existence of any such agreement; but, on the contrary, it devolves upon Brown to prove that such a contract or agreement was in fact made and entered into between the parties. Probably no such contract was ever made; but whether it was made, or not, is a question which should have been fairly submitted to the jury upon an instruction—not that the check *prima facie* proved the contract, and that it devolved upon Mullins to show that no such contract was ever made, but that the existence of the contract was a matter itself to be proved, and that it devolved upon Brown to prove the same.

The judgment of the court below will be reversed, and the cause remanded for a new trial.

All the Justices concurring.