GEORGE M. NOBLE *et al.* v. WILLIAM DOUGHTEN.

No. 14,309. (83 Pac. 1048.)

SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Title to Check Indorsed and Deposited.* If the payee of a check drawn on a bank in a city other than that of his residence indorse it and deposit it in his home bank in the usual and ordinary manner, and without any agreement or understanding in reference to the transaction other than such as the law implies, the check becomes the property of the indorsee.

2. ——— *Dishonor of Such Check—Ownership Not Affected.* The fact that the indorsee may have the right to charge the check to the depositor's account, if it should be dishonored after due diligence has been exercised to collect it, does not affect the character of the transfer or render the bank any the less the owner of the check.

3. ——— *Indorsement to Correspondent—Guaranty—Deposit—Title.* If a bank holding title to a check under the circumstances stated indorse it to the order of its correspondent in

Noble v. Doughten.

the city where the drawee bank is located, with a guaranty of the previous indorsement, and forward it with a deposit slip attached for credit as a deposit to such correspondent, who accepts it on the terms proposed by the indorsement and the deposit slip and undertakes to collect it, the title to the check, no further facts appearing, vests in the second indorsee.

4. ———— *Acceptance by Correspondent of Drawee's Check in Lieu of Cash.* If a bank holding title to a check under the circumstances stated in the last paragraph presents it for payment on the day of its receipt to the drawee, who then has funds of the drawer on deposit to meet it and who is ready to pay it in money, but, instead of taking cash, surrenders the check for the drawee's own check on another bank, it must use the utmost diligence to collect the second check or bear any loss which may be occasioned by the delay in case the drawer should become insolvent.

5. ———— *Insolvency of First Drawee—Second Presentment—Discharge of Parties.* Under circumstances of the character indicated in the last paragraph the presentment for payment of the first check, and the substitution of the second check in lieu of payment in money, fixes the rights of the parties; and after the insolvency of the drawee of the first check has occurred the negligent holder cannot charge the drawer and indorsers with liability by repossessing itself of the instrument, presenting it for payment a second time, and protesting it for non-payment; and this is true even although the first presentment might have been rightfully delayed for a longer period of time than that during which the drawee remained solvent.

6. ———— *Laches in Collection of the Substituted Check.* In this case presentment was made and a substituted check taken before noon of a business day closing at three P. M.; the substituted check could have been collected within twenty minutes; it was not presented for payment at all, but on the following day an attempt was made to collect it through the clearing-house; the drawer failed at 2:45 P. M. of that day and the check was then thrown out. *Held,* no diligence in collecting it appears.

7. ———— *Diligence Not Excused by a Local Custom.* A local custom of banks to take up checks drawn upon them by their depositors with their own checks on other banks will not excuse holders from exercising the utmost diligence in collecting the substituted checks.

8. ———— *Second Check—Mistake—Recovery by Drawer.* Un-

22—72 KAN.

der the facts of this case a drawer whose check was not collected because of the negligence of an indorsee is equitably entitled to recover from the payee, on the ground of mistake, the amount of a second check, issued on account of the supposed dishonor of the first one and duly paid.

Error from Shawnee district court; Z. T. HAZEN, judge. Opinion filed December 9, 1905. Reversed.

### STATEMENT.

NOBLE & Co., of Topeka, Kan., being indebted to William Doughten, of Philadelphia, made remittance by means of their check on Gilman, Son & Company, bankers, of New York. The check was forwarded from Philadelphia to New York, and when presented was taken up by Gilman, Son & Company with their own check on the Western National Bank, of New York. Before the latter check was presented Gilman, Son & Company failed. The payee of the check on the Western National Bank then repossessed itself of the Noble & Co. check and caused it to be presented and protested. Without knowledge of the facts Noble & Co. issued a second check for their original indebtedness, which was duly collected. Upon obtaining full information concerning the manner in which their first check had been handled, Noble & Co. sued Doughten for the amount of the second remittance. Judgment was rendered against them on the following findings of fact and conclusion of law:

### "FINDINGS OF FACT.

"(1) At and for some time prior to the times mentioned in these findings of fact the plaintiffs, George M. Noble, A. D. Washburn, and J. H. Noble, constituted a partnership, were doing business under the firm name of George M. Noble & Co., and were engaged in business in the city of Topeka, and among other things said partnership made collections for non-residents.

"(2) Prior to the 11th day of October, 1902, the plaintiffs made a collection for the defendant, William Doughten, amounting to $1548.75, and on said October

Noble v. Doughten.

11, 1902, the plaintiffs drew their check upon Gilman, Son & Company, of New York city, for $1543.75, payable to William Doughten, who then and for a long time prior thereto had resided in the city of Philadelphia, Pa., this being the amount due on said collection after plaintiffs had deducted their commission for making the same. Said check was in due course of mail forwarded to the defendant. A copy of said check is in words and figures as follows, to wit:

" 'No. 5022.     Geo. M. Noble & Co., Financial Agents.
                    TOPEKA, KAN., October 11, 1902.

" 'Pay to the order of Wm. Doughten ($1543.75) fifteen hundred forty-three and $\frac{75}{100}$ dollars.

GEO. M. NOBLE & CO.
By A. D. WASHBURN.

" 'To Gilman, Son & Company, New York.'

" (3)   The check described in finding No. 2 was received by the defendant Doughten on October 14, 1902, and on the same day was duly indorsed by him and deposited in the City Trust, Safe Deposit and Surety Company of Philadelphia, that being the banking-house in which the defendant transacted his business, and said check being deposited in the usual and ordinary course of business pursued in transactions of that kind.

" (4)   At the time the defendant received said check from the plaintiffs there was no agreement or understanding between him and plaintiffs that said check should be received in payment of the amount due from plaintiffs to defendant.

" (5)   The City Trust, Safe Deposit and Surety Company of Philadelphia, referred to in finding No. 3, on the same day said check was received by it for deposit forwarded the same to its New York correspondent, the Produce Exchange Bank, of New York, and the same was received by said Produce Exchange Bank on the morning of October 15, 1902, at about 8:30 o'clock A. M.   No letter of instruction accompanied said check, but a deposit slip was enclosed in the envelope therewith.

"Before forwarding said check as above recited, the City Trust, Safe Deposit and Surety Company placed thereon the following indorsement: 'Pay New York Exchange Bank or order.   Indorsements guaranteed. —THE CITY TRUST, SAFE DEPOSIT AND SURETY COMPANY OF PHILADELPHIA.   JAS. F. LYNDE, *Secretary and Treasurer.*'

"(6) The Produce Exchange Bank, referred to in finding No. 5, presented said check to Gilman, Son & Company, of New York, on October 15, 1902, some time before noon, and Gilman, Son & Company drew their check in favor of said Produce Exchange Bank for an equal amount upon the Western National Bank, and took up the check drawn by plaintiffs. At that time there was no agreement or understanding between Gilman, Son & Company and said Produce Exchange Bank that this transaction should constitute a payment of the check drawn by plaintiffs, as described in finding No. 2, but it was the usual and ordinary method of transacting business of that character in the city of New York.

"(7) At the time the check described in finding No. 2 was presented to Gilman, Son & Company said last-named company had on hand more than sufficient funds belonging to the plaintiffs to pay said check, and doubtless would have paid the same if the cash had been demanded by the party presenting the check. At the time, and for a long time prior thereto, Gilman, Son & Company had been engaged in the banking business in New York city, and was a reputable banking-house in good standing.

"(8) Said banking-house of Gilman, Son & Company closed its doors and ceased to do business at about 2:45 o'clock P. M. on October 16, 1902; suspended payment of all checks, and executed a deed of assignment on the evening of that day. The preparation of said deed of assignment was commenced immediately after said banking-house had closed its doors.

"(9) The check drawn by Gilman, Son & Company upon the Western National Bank in favor of said Produce Exchange Bank, as recited in finding No. 6, was presented in due course of business, passing through the clearing-house, and payment thereof was refused for the reason that Gilman, Son & Company had closed their doors and had no deposit in said Western National Bank out of which said check could be paid.

"(10) All of the New York banks referred to in these findings of fact were members of the clearing-house association of the city of New York, except the banking-house of Gilman, Son & Company. There are about sixty banks in New York city which belong to said association, and about twenty-five or thirty private banks and banking institutions in said city which do not belong to said clearing-house association.

"(11) The method in which the business of said clearing-house association of New York city is done, as between the banks belonging to said association, is substantially as follows: The checks deposited in a bank on any particular day are assorted and distributed into a rack in which each bank belonging to the clearing-house association has a pigeonhole, so that the checks upon different banks are collected together and made into packages. The next morning thereafter the packages so made up are sent to the clearing-house and delivered to the representatives of the several banks. There is a regular system or practice of delivering the checks at the various desks, so that when the checks are all delivered or exchanged clearance is made and each bank receives all checks drawn upon it, and each bank delivers to the representatives of all other banks checks drawn upon such other banks and paid through it. Each bank then foots up its debit and credit amounts, and if the result is a debit balance it is required to send to the clearing-house by half-past twelve o'clock that day the cash necessary to provide for said debit balance; but if such bank has a credit balance, it receives its cash credit about half-past one o'clock that day.

"(12) Where a check is drawn by one bank upon another bank, either being a member of the clearing-house association, the custom is for said check to go through the clearing-house for collection. The aggregate amount of checks passing through said clearing-house association of New York city each day would amount approximately to $250,000,000. The number of checks so handled through the clearing-house per day is ordinarily numbered in the millions. There is no charge made by New York banks for the collection of checks in the city of New York.

"(13) When the check of plaintiffs was presented to Gilman, Son & Company, and that bank issued its check therefor, the plaintiffs' check was stamped 'paid,' and after the check of said Gilman, Son & Company had been dishonored by the Western National Bank, and after Gilman, Son & Company had closed their doors and made an assignment for the benefit of their creditors, the Produce Exchange Bank sent its representative to Gilman, Son & Company and procured the check which had been drawn by the plaintiffs, described in finding No. 2, to be protested for non-payment.

"(14) The check drawn by Gilman, Son & Company upon the Western National Bank in favor of the Produce Exchange Bank, as recited in finding No. 6, was received at the Produce Exchange Bank about 2:30 o'clock P. M. on October 15, 1902, was charged to the Western National Bank, the stamp of said Produce Exchange Bank was placed upon the check, and the same was assorted and distributed, as any other check that came in, after being stamped 'paid.' Said check remained in said Produce Exchange Bank, assorted and distributed as above recited, until five o'clock on October 15, when it was placed in the safe over night, and on the morning of the 16th of October the same was taken from the safe and placed in the pigeonhole where it had been after assorting and distributing on the day before. Said check went through the usual course of the clearing-house and went into the hands of the Western National Bank. The representative of said Produce Exchange Bank left said bank with said check and others about twenty minutes before ten o'clock A. M., and reached the clearing-house at about fifteen minutes before ten o'clock on October 16, and said check then passed to the hands of the Western National Bank at about eight minutes after ten o'clock. It takes about ten minutes to walk from the banking-house of Gilman, Son & Company to the Produce Exchange Bank, at the ordinary rate of speed, and would take about ten minutes to walk from the Western National Bank to the Produce Exchange Bank.

"(15) The usual closing hour for all banking-houses in the city of New York at the time of the transaction referred to in these findings of fact was three o'clock P. M.

"(16) When the defendant, William Doughten, was notified that the plaintiffs' check had been dishonored he issued his personal check for the amount of said dishonored check, and the same was presented and paid. Thereafter, and on October 17, 1902, the defendant, Doughten, notified the plaintiffs by telegram of the dishonor of their check, and the plaintiffs immediately issued their check to the defendant for the same amount, which check was promptly paid.

"At the time that plaintiffs issued their second check, above referred to, to the defendant, Doughten, the individual members of plaintiffs' firm had no notice or knowledge of the various transactions which had taken place after the plaintiffs' original check had

been received by the defendant; and said second check was issued by plaintiffs to the defendant, Doughten, while plaintiffs still believed that their check on the banking-house of Gilman, Son & Company in favor of the defendant had been dishonored in the regular course of business.

"The check drawn by the defendant, Doughten, to take up the dishonored check referred to above was dated October 17, 1902, and after taking the usual course of business it was paid on the 24th day of October.

"Under the statutory law of New York a check must be presented for payment within a reasonable time after its issuance or the drawer thereof will be discharged from liability thereon to the extent of the loss caused by the delay."

"CONCLUSION OF LAW.

"Upon the foregoing facts the plaintiffs are not entitled to recover, and judgment should be rendered in favor of the defendant."

*Rossington & Smith,* for plaintiffs in error.

*J. W. Gleed,* and *J. L. Hunt,* for defendant in error; *Gleed, Ware & Gleed,* of counsel.

The opinion of the court was delivered by

BURCH, J.: This controversy arose over a bank-check. The instrument was an order upon a banking-house for the unconditional payment, instantly upon demand, of a specified sum of money to the order of a person named, and purported to be drawn upon a deposit of funds. (*The State v. Warner,* 60 Kan. 94, 96, 55 Pac. 342; 7 Cyc. 529.)

The check was sent to the payee for the purpose of satisfying an obligation due him from the drawers. The delivery of the check did not pay the debt, and its acceptance did not constitute even *prima facie* evidence of payment. (*Kermeyer v. Newby,* 14 Kan. 164; *Mullins v. Brown,* 32 Kan. 312, 4 Pac. 305.) But the acceptance of the check imposed upon the payee the necessity of using due diligence to realize upon it in order to escape responsibilty for loss, if in the mean-

time the drawee should become insolvent. (*Anderson v. Rodgers*, 53 Kan. 542, 36 Pac. 1067, 27 L. R. A. 248; *Kilpatrick v. B. & L. Association*, 119 Pa. St. 30, 12 Atl. 754; *Freeholders of Middlesex v. Thomas & Martin*, 20 N. J. Eq. 39.)  And, if he should be guilty of laches in this respect resulting in loss or damage to the drawer, satisfaction of the original debt, to the extent of the injury, would follow. (22 A. & E. Encycl. of L. 572.)

The payee indorsed the check, and deposited it in the Philadelphia bank with which he was in the habit of dealing, according to the business forms under which transactions of that character are usually conducted.  The legal effect of such conduct, where no reservations are made or limitations are imposed by either party, and no agreement or understanding appears other than that which the law implies, is well settled by the best-considered cases.  When the payee of the check received credit for it the bank became indebted to him in a sum equal to the amount of the credit, his funds in the bank subject to immediate withdrawal upon his check were augmented to the same extent, the check itself became the property of the indorsee, and the payee's relation to it became that of one who had transferred title to it by indorsement.

If the depositor had desired to establish the relation of principal and agent between himself and the depositary he should have indorsed the paper for collection merely, or otherwise should have indicated his purpose; and if the bank did not intend to accept the check as money it should have entered it as paper and not as cash, or otherwise should have made manifest its intention to collect merely. (2 Morse, Banks & Bank., 4th ed., § 583.)  The law upon this subject is quite fully considered in the recent case of *Burton v. United States*, 196 U. S. 283, 25 Sup. Ct. 243, 246, 49 L. Ed. 482, in which Mr. Justice Peckham said:

"There was no oral or special agreement made be-

tween the defendant and the bank at the time when any one of the checks was deposited and credit given for the amount thereof. The defendant had an account with the bank, took each check when it arrived, went to the bank, indorsed the check, which was payable to his order, and the bank took the check, placed the amount thereof to the credit of the defendant's account, and nothing further was said in regard to the matter. In other words, it was the ordinary case of the transfer or sale of the check by the defendant and the purchase of it by the bank, and upon its delivery to the bank, under the circumstances stated, the title to the check passed to the bank and it became the owner thereof. It was in no sense the agent of the defendant for the purpose of collecting the amount of the check from the trust company upon which it was drawn. From the time of the delivery of the check by the defendant to the bank it became the owner of the check; it could have torn it up or thrown it in the fire or made any other use or disposition of it which it chose, and no right of defendant would have been infringed." (Page 297.)

It may be conceded that if, after due and legal effort to collect the check, it should be dishonored, the bank would have the right to charge the amount of it to the depositor's account. Whether this right may be said to rest merely on the custom of banks, or whether the custom has been crystallized into a rule and the right now may be said to be an implied condition attaching to the transfer of the paper, makes no difference. It is, nevertheless, in strictness, the right of an indorsee against an indorser, and hence is not in any sense inconsistent with ownership.

"The testimony of Mr. Brice, the cashier of the Riggs National Bank, as to the custom of the bank when a check was not paid of charging it up against the depositor's account, did not in the least vary the legal effect of the transaction; it was simply a method pursued by the bank of exacting payment from the indorser of the check, and nothing more." (*Burton v. United States*, 196 U. S. 283, 297, 25 Sup. Ct. 243, 246, 49 L. Ed. 482.)

"If paper be deposited in or forwarded to a bank

for collection, and in pursuance of a prearranged mode of dealing the bank immediately places the amount to the credit of the depositor, and the depositor thereupon draws or is entitled to draw against the same as cash, this works a transfer of title, so that the depositor cannot afterward claim the paper; and it is immaterial that if the paper is not paid the bank has the right to charge it back." (*Ayres v. The Farmers' & Merchants' Bank*, 79 Mo. 421, 49 Am. Rep. 235.)

"The agreement to charge back if any draft was not paid did not affect the character of the transaction. That was nothing more than would have resulted without any such agreement, unless the indorsements to the Fidelity were expressly without recourse. If the drafts were purchased by the Fidelity out and out with a general indorsement, the case would differ from the case presented to the court only in the respect that, upon the failure of the drawee to meet the draft, protest would have been necessary, whereas it may be that, by virtue of the agreement, protest was not necessary." (*First Nat. Bank v. Armstrong*, 39 Fed. [C. C.] 231, 233.)

The payee having received the equivalent of cash for the check, and having parted with title to it, the indebtedness of the drawer to him was satisfied, subject only to the contingency that he should be held liable as an indorser of the paper in the event of its dishonor, due diligence having been exercised to protect the drawer and to charge him.

"It is true no express agreement was made transferring the check for so much money, but it was delivered to the bank and accepted by it, and the bank gave Murray credit for the amount, and he accepted it. That was enough. The property in the check passed from Murray and vested in the bank. He was entitled to draw the money so credited to him, for as to it the relation of debtor and creditor was formed, and the right of Murray to command payment at once was of the very nature and essence of the transaction. On the other hand, the bank, as owner of the check, could confer a perfect title upon its transferee, and, therefore, when by its directions the plaintiff received and gave credit for it upon account, it became its owner and entitled to the money which it rep-

resented. The check, therefore, for every purpose material upon this inquiry, as between these parties was money." (*Metropolitan National Bank v. Loyd,* 90 N. Y. 530, 535.)

Under the same rules the indorsement of the check to the order of the transferee's New York correspondent, its delivery with a deposit slip attached for credit as a cash deposit, and its acceptance upon the terms proposed by the indorsement and the deposit slip, without more appearing, doubtless operated to transfer title, and the Produce Exchange Bank became the owner of the check.

The check was received at Philadelphia on October 14, and on that day forwarded to New York, where it was received on the morning of October 15. As the holder of the check the Produce Exchange Bank might have delayed making demand for payment until just before three o'clock P. M. (the hour for closing business) on October 16, and, had it done so, any loss occasioned by the drawee's insolvency (which occurred at 2:45 o'clock P. M. of that day) would have fallen upon the drawer. (*Anderson v. Rodgers,* 53 Kan. 542, 36 Pac. 1067, 27 L. R. A. 248.) But it did not exercise its privilege and remain quiescent. It chose to act, and before noon of October 15 it presented the check for payment. When the check was presented the drawee might have assumed an attitude which for some purposes would not have amounted to either a compliance with or a refusal of the demand for payment, but it did not do so. It undertook by positive and affirmative conduct to meet the obligation which the check imposed. The situation then required further action on the part of the holder, and it responded in a definite and unequivocal way. Although the drawee had funds of the drawer on deposit at the time to meet the check, the holder surrendered it to the drawee, who stamped it "paid," and accepted the drawee's own check on the Western National Bank, of New York, in place of the cash, to which it was en-

titled and which it might have had for the mere taking.

It is true that the law is not so rigid in respect to the conduct necessary to preserve the liability of the drawer of a check as it is in the case of a draft. Failure to make demand within a reasonable time and to give notice of non-payment do not peremptorily discharge the drawer of a check. Unless he suffer some loss on account of the lack of diligence displayed he is not ordinarily released from liability.

"In order to charge the drawer of a check, the same strict rule of diligence in making demand and giving notice of non-payment does not obtain as in cases of ordinary bills of exchange. As a general rule, he is not discharged unless he suffers some loss in consequence of the delay of the holder." (*Gregg v. George*, 16 Kan. 546, syllabus.)

A failure to demand payment of a check from a suspended bank could scarcely result in damage to the drawer, and hence laches of the holder in this respect would not release him.

"I think that the plaintiff was not guilty of laches in not presenting the check of the defendant to the bank before it was closed, on the morning of the day following its delivery. The authorities are abundant that the holder of a check has the day after it is delivered in which to make a presentment for payment. . . . The rule is settled that, in case of a check, the drawer is to be treated the same as a principal debtor, and he is not discharged by any laches of the holder in not making due presentment thereof, or in not giving him notice of dishonor, unless he has suffered some loss or injury thereby, and then only *pro tanto.* . . . As the defendant was not discharged by the failure to present the check to the bank before it stopped payment, it is difficult to see how a neglect afterward to make a presentment to and demand of a confessedly insolvent party could occasion any loss or injury to the drawer. It would not prevent a recovery of the bank by the defendants of the amount in their possession, which they had neglected to pay, and for which no demand had been made, and hence how could the defendant be damnified?" (*The Syracuse, Bing-*

*hamton and New York Railroad Co. v. Collins,* 3 N. Y. Supr. Ct. 29, 31.)

(See, also, *Cawein v. Browinski,* 69 Ky. 457, 99 Am. Dec. 684.)

But, because the drawer of the check in controversy may not have been discharged by the mere fact that the holder upon presenting it did not require payment in money, it does not follow that the same time remained to the holder after the drawee's failure in which to make presentment as would have remained to him if he had chosen to remain passive in the first instance. Before the suspension of the drawee, not only had a formal presentment for payment been made, but the holder and the drawee had substituted and put into operation in place of payment a scheme of their own which was not expressed in, and could not be implied from, the terms of the check when it left the drawer's hands. This factor in the relations of the parties cannot be overlooked. The drawer's guaranty is that the drawee shall remain solvent until the check with due diligence can be presented, but he grants no authority to the payee to extend that obligation. The holder is allowed the day after the receipt of the check in which to make presentation, in order to meet contingencies and the reasonable requirements of his business needs. But this time is not allowed to him for purposes of experiment, and when demand once has been made upon the drawee, who is in funds and ready to pay, and money is not taken, a point of departure in the rights of the parties has been established that cannot be ignored or repudiated at the will of the holder, to the detriment of the drawer.

"If presentment for payment be actually made on the very day the check is drawn, and payment tendered, the holder cannot then change his mind and leave the funds at the drawer's risk until the next day. He is allowed until the next day as matter of convenience and accommodation to him; and while he need not hurry to make presentment the same day, having once done so, he has fixed the money at his own

risk." (2 Dan. Neg. Inst. § 1593. To the same effect is 2 Morse, Banks & Bank., § 426.)

These texts are based upon the case of *Simpson v. Pacific M. L. Ins. Co.*, 44 Cal. 139, in which the conduct of the holder in presenting a check to the drawee is analyzed and its legal effect stated as follows:

"The presenting of a check for payment implies that the holder of it desires and is ready and willing to accept payment. It would be a contradiction in terms to say that the holder of a check presented it for payment intending and averring at the time that he would not accept payment. If he should present it for the sole purpose of ascertaining whether the signature was genuine, or whether the drawer had funds to his credit, or merely for the purpose of being identified as the person entitled to payment, not intending then to present it for payment, it is clear that this would not constitute a demand of payment, which, in its very nature, imports a willingness on the part of the holder to accept the money at that time. But if the check is presented for payment, with the present intention in the mind of the holder to accept the money if tendered, this must be deemed to be a demand of payment for all purposes affecting the rights of the drawer, even though the holder should afterward change his purpose and decline to accept the money when tendered by the bank. Having once demanded payment in due form and within the proper time, and the bank being then and there ready and willing and offering to pay the check, the holder is not at liberty after this to retract or waive his demand and decline to accept payment without thereby releasing the drawer from further liability on the check. If the holder declines to accept payment when it is tendered on a proper demand, the liability of the drawer ceases, for the reason that his undertaking was that the check would be paid when payment should be first demanded in due form and within the proper time; but he does not undertake that it will be paid on a second demand, when payment has been tendered and refused on a prior demand made in due form and within the proper time." (Page 143.)

It is true that in *Simpson v. Pacific M. L. Ins. Co.* cash was tendered and declined, but the principle in-

voked applies equally to a holder who might have had cash but who, for purposes of his own, surrendered his paper for the drawee's check. Such is the view of the editors of the two leading series of reports of selected cases.

"A check on a banker calls for money, and if money is not taken when it is presented to the drawee it must be either because some other mode of payment or course of dealing is more convenient to the payee or because it is more advantageous to the bank that money should not be paid. In the former case, *i. e.*, where the payee for his own convenience accepts something besides money for the check, he surely should not be allowed to charge the drawer with loss resulting from such election, and if it is for the convenience of the bank, the very fact that the bank makes the request is so suspicious that it ought to put the payee upon inquiry and incite him to diligence to secure the money, which unless satisfied of the safety of some other means of payment would require him to demand the money at once." (25 L. R. A. 201, note.)

"The holder of a check need not hurry to make presentment for payment on the same day it is received, but, if he does so, it fixes the rights of the parties. He cannot then change his mind and leave the funds at the drawee's risk until the next day. If he, on the first presentment, takes a substituted check on another bank in lieu of cash, it amounts to payment, and if the drawee fails on that day the payee cannot, after neglect to use the utmost diligence in presenting the substituted check for payment, put himself, by a subsequent demand upon the original drawee, in the same position he would have occupied had he not made the first demand." (51 Am. St. Rep. 94, note.)

Such was the specific holding in the case of *Anderson v. Gill*, 79 Md. 312, 29 Atl. 527, 25 L. R. A. 200, 47 Am. St. Rep. 402, in which *Simpson v. Pacific M. L. Ins. Co.*, 44 Cal. 139, was cited as an authority, and in which it was said:

"Whilst the Old Town Bank was not bound to have made demand upon Nicholson & Sons when it was made, still, having made it, and, by its own choice, not having received the cash, it cannot, if it has not

used due diligence, claim the right to undo what it had done, and by a subsequent demand put itself in the position it would have occupied had it not made the first demand at the time it did make it, or done the act it then did." (Page 321.)

And such is the doctrine upon which the decision in the case of *Comer v. Dufour*, 95 Ga. 376, 22 S. E. 543, 30 L. R. A. 300, 51 Am. St. Rep. 89, was rested:

"If the check is received at a place distant from the place where the bank upon which it is drawn is situated, and is forwarded by due course of mail to a person in the latter place for presentment, the person to whom it is thus forwarded has until the close of banking hours on the next secular day after he has received it to present it for payment, unless there are special circumstances which require him to act more promptly. (2 Morse, Banks, 3d ed., § 421; Dan. Neg. Inst., 4th ed., § 1591.) The holder cannot, however, after having once presented the check, derive any advantage from the fact that he could, without being chargeable with unreasonable delay, have held it longer before making presentment. The first presentment fixes the rights of the parties. If the drawee is then ready and willing to pay, and the holder allows the fund to remain longer in the hands of the drawee, or if he accepts in lieu of money a check of the drawee, he does so at his peril." (Page 379.)

In the case of *Burkhalter v. The Second Nat. Bank*, 42 N. Y. 538 (which professes to rely upon the case of *Turner v. The Bank of Fox Lake*, 3 Keyes [N. Y.] 425), and the case of *Kelty v. Second National Bank of Erie*, 52 Barb. (N. Y. Supr. Ct.) 328, checks were taken in lieu of cash on the presentation of bills of exchange proper. The checks were dishonored, and the bills were then recovered, presented a second time, and protested, all within the time allowed in the first instance for presentment and protest. In each of these cases the decision was made to depend upon the question of whether or not acceptance of the check amounted to payment of the draft, and considerable effort was expended to show that such was not the result—a proposition concerning which there is no

Noble v. Doughten.

longer any dispute. It was virtually assumed in each
case that if the draft were not paid by the taking of
the check its vitality was not suspended; that it con-
tinued to be a valid obligation; and that protest within
the time allowed by the rules of commercial law fixed
the status of all parties. The subject now under con-
sideration was neither pressed upon the attention of
the court by counsel nor discussed by the justices de-
livering the opinions.

In the case of *First Nat. Bank v. Fourth Nat. Bank,*
77 N. Y. 320, 33 Am. Rep. 618, all that is said upon the
question of the liability of the drawer is *dictum;* and,
if it were necessary to distinguish the earlier New
York cases, a principle of discrimination might be
found in the difference of purpose between checks and
drafts and the difference in treatment usually ac-
corded them. But so far as the briefs of counsel dis-
close, and the court is aware, no satisfying reason has
yet been given for allowing the holder of a check,
which calls for cash, voluntarily to disregard its legal
intent, attempt to settle the drawee's liability upon
other terms than those proposed by the drawer, and
then, after disaster has occurred, to rescind *in toto*
and escape responsibility, even though he has had
abundant opportunity to protect the drawer while fol-
lowing the course he first elected to pursue.

It is the sole function of a check to effect the trans-
fer of money. It is of the essence of its definition that
it is payable in money.

"Where a check is drawn for a given number of dol-
lars, without in any other manner designating in what
kind of money it is to be paid, it is payable in coin, if
demanded, or current money. Nor can such a check
be explained, either by verbal agreement or by custom,
or any mercantile or other usage, to have any other
or different meaning than that." (*Howes v. Austin,*
35 Ill. 396.)

None of the parties to the instrument contemplates

payment in anything else than money, and whenever a check is presented against funds on deposit to meet it, which the drawee is then ready and willing to deliver, the contract of the drawer has been fulfiled. To extend the drawer's liability further without his knowledge or consent would seem to be unjust. The acceptance by the holder of any other medium of payment than that expressed in the contract apparently ought to be at his own risk, and the doctrine that the acceptance of a substituted check is not payment unless it be paid seemingly should be limited in its application to the arrangement between the holder and drawee, and should be of no force to extend the liability of the drawer and indorsers.

This is the effect of the decision in *Simpson v. Pacific M. L. Ins. Co.*, 44 Cal. 139, as to an accommodation indorser. The point is clearly made by Mr. Farnham in his note to the case of *Anderson v. Gill*, in 25 L. R. A. 201, already quoted, and it was suggested in the case of *Comer v. Dufour*, 95 Ga. 376. Such undoubtedly is the law where the new arrangement takes the form of a certification of the check. (*Met. Nat. Bank of Chicago v. Jones et al.*, 137 Ill. 634, 27 N. E. 533, 12 L. R. A. 492, 31 Am. St. Rep. 403, and authorities there cited; *Girard Bank v. Bank of Penn. Township*, 39 Pa. St. 92, 80 Am. Dec. 507; *First Nat. Bank, etc., v. Whitman*, 94 U. S. 343, 24 L. Ed. 229; 22 A. & E. Encycl. of L. 572.) Upon principle it would seem that the holder of a check, which speaks of nothing but money on deposit, payable on demand, ought to have no greater license to jeopardize the drawer by receiving a mere obligation to pay in place of money than an agent for collection would have as against his principal. (See 5 Cyc. 505.) The language of Justice Treat in *Merchants' Nat'l Bank v. Samuel*, 20 Fed. (C. C.) 664, appears to be quite pertinent:

"The payment of the draft was to be in cash; and if anything except cash was received, and in consequence thereof the drawer of the draft was damnified,

then the damages sustained he has a right to be indemnified for by the negligent party. In this case, the plaintiff bank having received the draft, and presented the same, and received a check for the amount thereof instead of cash, the drawee having had funds to meet his check, which would have been paid if presented that day, and before the said check passed through the clearing-house on the next day the drawers, Parks & Co., whose check had been received, had failed, whereby the check was dishonored, the loss so caused must fall on the plaintiff, and not on the defendant. The draft should have been paid in cash; and if the plaintiff chose to receive, instead of cash, the drawee's check, it did so at its own risk, and, if any loss followed, the plaintiff must bear the same."

However, in deference to the reluctance of the commercial world and of the courts to relieve the drawers of checks from liability without actual payment's having been received, this matter, although directly involved and proper to discuss, may be passed without decision, and attention be directed to the fair question lying beyond it of what the holder ought to do to protect the drawer and indorsers from loss in case he should accept a second check. Upon this proposition the law is clear. Nothing but the utmost diligence will suffice. The case of *Anderson v. Gill*, 79 Md. 312, already referred to, is the leading authority upon the subject. The facts were so similar to those under review that no distinction can be made in the application of the controlling principle. In the course of the opinion, which collates and discusses the authorities, it was said:

"The rule fixing the close of business hours of the next secular day as a reasonable time within which a check may be presented, so as to hold the drawer when drawn on a bank in the same place where it is delivered, has relation only to the contract and liability of the parties to the instrument, and does not apply to a check given by the drawee to the payee, or to the agent of the payee, of the original check, upon its surrender. . . . The holder of a substituted check taken upon the surrender of the original check to the drawee

thereof must use such diligence in presenting it for payment as a prudent man would under like conditions use. This imposes no hardship upon the person who voluntarily accepts the drawee's check instead of cash. If he has had ample and abundant time to convert the drawee's check into money, and still omits to do so, he obviously has not used due diligence, and the results of such negligence should not be visited upon the original drawer, who was in no way responsible therefor. Whether a delay to present the drawee's check till the close of business hours is due diligence cannot be asserted as an invariable rule. In some instances it might be, whilst in others it would manifestly not be. . . . That a higher degree of diligence is demanded under facts like those before us than that which obtains between the parties to the instrument is obvious, because, as we have said, the drawer of the original check must be held to have contemplated that when presented it would be paid in money only, and the payee and drawee have no right, except at their own peril, to substitute some other mode of settlement which results in injury to the drawer. . . . We hold, then, that when the payee of a check, or his agent, takes from the drawee, who has ample funds of the drawer, a check of the drawee on some other bank or banker, instead of money, he, the payee, or his agent, must use the utmost diligence to present the substituted check for payment. . . . That Anderson was in fact injured by what was done is manifest, and it is no answer to say he might or would have been equally injured had the holder of the check remained passive until after the failure of Nicholson & Sons. In the one case the injury was the direct result of the payee's negligence after the presentation of Anderson's check to the drawees; in the other, had it occurred, it would have been only incident to a mere permissive or lawful inaction or passivity." (Pages 319-322.)

The case of *Comer v. Dufour*, 95 Ga. 376, expressly approves the doctrine of *Anderson v. Gill,* and in the same connection states:

"If his [the holder's] acceptance of the drawee's check does not of itself discharge an indorser of the original check, the indorser should certainly be held discharged if the substituted check is not presented

Noble v. Doughten.

promptly and the collection is thereby defeated. Such presentment cannot be delayed at the risk of the indorser for any time beyond that within which, with reasonable diligence, the presentment can be made. In this case it appears that presentment of the substituted check could have been made in about five minutes from the time it was received, the bank upon which it was drawn being only three squares distant from the bank of J. J. Nicholson & Sons, the drawees of the original check; but it was not presented for two hours and a half or more after it was received by the collecting bank, and by reason of this delay the collection was defeated. Under these circumstances, we think the collecting bank failed to exercise due diligence, and its principal, the plaintiff in this case, was not entitled to recover against the defendant, the indorser of the original check." (Page 379.)

In this case the Gilman & Company check upon the Western National Bank was received by the Produce Exchange Bank before noon of October 15. It was not thrown out at the clearing-house until after the Gilman & Company failure had occurred — at fifteen minutes before the close of business on October 16. It could have been cashed within twenty minutes from the time it was issued, or more than twenty-four hours before the drawers suspended. Under these circumstances it must be held that the holder and owner of the Noble & Co. check was negligent in not taking the necessary steps to collect the second one, and that as a result of such negligence the deposit of Noble & Co. in the Gilman bank was lost.

Some attempt is made to justify the conduct of the holder under the custom of the banks of New York disclosed by the findings of fact. It is not entirely clear that reasonableness should be conceded to a local custom that would subvert the character of a bank-check to the extent claimed for the custom disclosed (*Bank v. Bank*, 151 Mo. 320, 52 S. W. 265, 74 Am. St. Rep. 527), although the volume of business to be transacted daily in New York and the dangers incident to filling the streets with messengers carrying cash

argue strongly in its favor. The danger incident to cash collections, however, could be avoided by obtaining a certification of substituted checks, and in no event can a custom contravene an established rule of law, such as that requiring the utmost diligence to collect substituted checks (29 A. & E. Encycl. of L. 383), or justify negligence in the collection of such checks.

"The conclusion to be drawn from these cases and the text-books cited by counsel is, that a draft may be surrendered and a check taken therefor, but all reasonable diligence must be used in presenting such check for collection, and if such diligence be used and the check is not promptly paid or certified, then that the draft may be at once reclaimed. No general custom, if such custom existed, would excuse the collecting bank from exercising all reasonable diligence in collecting such check, and certainly a special usage would have no greater effect in excusing the bank than would a general custom. *National Bank of Commerce v. The Am. Ex. Bank*, 151 Mo. 320, 52 S. W. 265, 74 Am. St. Rep. 527; *Minneapolis v. Metropolitan Bank*, 76 Minn. 136, 78 N. W. 980, 44 L. R. A. 504, 77 Am. St. Rep. 609; *Marine Bank v. Chandler*, 27 Ill. 525, 81 Am. Dec. 249; *Webster v. Granger*, 78 Ill. 230." (*Bank of Commerce v. Miller*, 105 Ill. App. 224, 233.)

The holder of the check having fixed the funds at its own risk by failure to take possession of them, subsequent efforts to bind the previous parties by protest and notice were nugatory; and the only remaining question is, Will equity permit the plaintiffs to recover, their action being founded upon mistake? The plaintiffs did nothing to influence the conduct of any of the parties who dealt with their check. The Produce Exchange Bank could not charge its negligent conduct upon the Philadelphia bank, nor that bank aid the Produce Exchange Bank to avoid the consequences of its carelessness by charging the check to Doughten. So far as the Produce Exchange Bank is concerned the check was paid, and because of that fact the original debt for which the check was issued was paid. Doughten could not by a voluntary payment to his

bank carry the holder's fault back to Noble & Co. and impose its consequences upon them. Noble & Co. acted alone upon the information Doughten gave them, and this information did not disclose the true state of affairs. Therefore, to deny relief against Doughten would be to permit him to profit by his own conduct, the effect of which was to mislead, and to compel Noble & Co. to pay their debt twice.

The judgment of the district court is reversed, with direction to enter judgment for the plaintiffs upon the findings of fact.

All the Justices concurrring.