No. 41,822

NORTH RIVER INSURANCE COMPANY, *Appellant,* v. AETNA FINANCE
CO., *Appellee.*

(352 P. 2d 1060)

Opinion filed June 11, 1960.

*Arthur L. Claussen,* of Topeka, argued the cause, and *A. Harry Crane, Ward
D. Martin,* and *Harvey D. Ashworth,* all of Topeka, were with him on the briefs
for the appellant.

*James L. Grimes, Jr.,* of Topeka, argued the cause, and *M. F. Cosgrove,
Robert E. Russell, Willard N. Van Slyck, Jr., William B. McElhenny,* and *O. R.
Stites, Jr.,* all of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

JACKSON, J.: The insurance company sued the finance company
alleging that it had paid to the defendant the sum of $1,390 to
satisfy an insurance claim under the mistaken belief that the auto-
mobile covered by an insurance policy had been stolen; that in
truth and in fact, the automobile was never stolen. The defendant
company relied entirely upon the defense of a change of position
made by the defendant after receiving the insurance money. The
plaintiff appeals from an adverse judgment of the trial court.

In the briefs and oral arguments there has been some discussion
of the nature of the present action. As early as the times of Oliver

Cromwell, courts of law in England held that the action of general or indebitatus assumpsit would well lie on the common count of money had and received, where the plaintiff showed that he had under mistake of fact paid money to defendant under a supposed duty. Attention is directed to the decision in the year 1657, in the case of *Bonnel v. Fouke*, 2 Siderfin 4; translated from the Norman French and reprinted in Scott & Simpson, *Civil Procedure* 104; also *Noble v. Doughton*, Syl. ¶ 8, 72 Kan. 336, 83 Pac. 1048, 3 L. R. A. (NS) 1167; *Highway Comrs. v. Bloomington*, 253 Ill. 164, 97 N. E. 280.

In considering the nature of the action, it should be remembered that general assumpsit was the action in which the courts of law borrowed principles of equity from the courts of equity and implied or imposed a promise or duty to repay money upon a defendant, if he had received the money wrongfully, although there was in fact no such promise. Most of the law relating to the subject of quasi-contracts stems from the old action of general assumpsit.

The present case was tried to the court below upon a stipulation of almost all of the facts. In this situation, this court having the same opportunity as the trial court to consider the facts, must in effect treat the appeal as a trial *de novo*. In *Keimig v. Drainage District*, 183 Kan. 12, at 15-16, 325 P. 2d 316, and *In re Estate of Kemper*, 157 Kan. 727, at 734, 145 P. 2d 103, will be found large collections of the decisions of this court upon this point. In the Kemper case, it was said:

"Under such circumstances when the evidence is written, documentary in character or in the form of depositions or transcripts, it is the duty of this court to decide for itself what the facts establish, substantially as it would in an original case (citing authorities)." (p. 734.)

Still another principle of civil procedure may be noted in view especially of the duty of this court as to the facts. It would seem that the defense of the defendant finance company in this case is really one of estoppel *in pais* or equitable estoppel. As to that issue, there can be no doubt that it is an affirmative defense to be pleaded and proved by the defendant who asserted it (*Palmer v. Blodgett*, Syl. ¶ 2, 60 Kan. 712, 57 Pac. 947; *Painter v. Fletcher*, 81 Kan. 195, 105 Pac. 500; *Langston v. Hoyt*, 108 Kan. 245, 250, 194 Pac. 654; *Muenzenmayer v. Luke*, 161 Kan. 597, 602, 170 P. 2d 637; 31 C. J. S. *Estoppel*, § 153 and § 160; 19 Am. Jur. *Estoppel*, § 179 and § 198).

The defense of change of position was pleaded in defendant's answer and the sufficiency thereof is not challenged. Therefore, the facts agreed upon at the trial must be examined to ascertain whether there has been a showing of a change of position sufficient to constitute a defense to the action of the plaintiff upon the implied promise to repay the money mistakenly received.

The stipulation of facts submitted to the trial court is in numbered paragraphs. We shall endeavor to summarize part of the stipulation and thereby shorten this opinion, but shall refer to the numbered paragraphs to aid reference thereto.

Paragraphs 1 and 2 recite the incorporation of the parties and their ability to do business in Kansas.

In paragraphs 3 and 4, it appears that on August 17, 1955, defendant made a loan in the gross amount of $1,836 to one J. Earl Wilson, and as collateral security therefor "obtained a chattel mortgage describing, *among other items,*" a certain 1953 Buick Riviera Sedan, which on the same day was insured against theft and other hazards by plaintiff in an insurance policy. A copy of the insurance policy was attached to the stipulation, and the pertinent portion thereof reads as follows:

"Loss Payee: Any loss hereunder is payable as interest may appear to the insured and Aetna Finance Company 728½ Kansas Avenue, Topeka, Kansas."

The stipulation of facts continues as follows:

"5. Sometime in February, 1956, the account of J. Earl Wilson with defendant became delinquent and defendant commenced normal collection efforts. After several phone conversations with Mrs. Wilson concerning the delinquency, the Wilsons moved without notifying defendant. On or about April 3, 1956, a representative of defendant located the Wilsons new residence and called upon them. Defendant was advised by Mrs. Wilson, the wife of J. Earl Wilson, that Mr. Wilson was a patient at Topeka State Hospital. Mrs. Wilson further advised defendant that the above described automobile had been removed on or about March 31, 1956, and that she had thought defendant had repossessed it. Defendant's representative advised Mrs. Wilson that it had not repossessed it and Mrs. Wilson then suggested that the vehicle must have been stolen. Defendant thereafter on or about April 5, 1956, reported the suspected theft of said automobile to the Topeka Police Department and that Department in turn contacted Mrs. J. Earl Wilson and obtained a formal suspected theft complaint from her. Thereafter said suspected theft was reported to the National Automobile Theft Bureau and the Kansas Highway Patrol.

"6. On or about April 5, 1956, the defendant notified plaintiff of the suspected theft of said automobile. The plaintiff referred the report to the firm of Underwriter's Adjusting Company, Topeka, Kansas, which firm engages in insurance claim investigation and adjusting, and Mr. Irven F. Jacobs of that

firm checked with the Topeka Police Department and found that said automobile was reported stolen on April 5, 1956, as occurring on March 30 or 31st. A copy of the police report is attached hereto and marked Exhibit B.

"7. On or about June 18, 1956, defendant was advised by Mr. Jacobs of the Underwriter's Adjusting Company that plaintiff would pay defendant for the loss of its security in accordance with the terms of plaintiff's insurance policy. At said time, Mr. Jacobs presented the proof of loss form to defendant for execution and Mr. Jacobs permitted the execution of said proof of loss by defendant in lieu of execution by the named insured, J. Earl Wilson, because of Mr. Wilson's hospitalization. A copy of said proof of loss is attached hereto and marked Exhibit C.

"8. Following the execution by defendant of said proof of loss, plaintiff paid to defendant as loss payable payee, the sum of $1,390.00 being the full value of said automobile as of March 30, 1956. Upon receipt of plaintiff's check defendant executed and delivered to plaintiff a Hold Harmless Agreement which is attached hereto and marked Exhibit D.

"9. Thereafter, both plaintiff and defendant discovered that the said automobile had never been stolen. That on April 6, 1956, a Kansas duplicate title No. 2280408A covering the above described 1953 Buick automobile was obtained from the Kansas Motor Vehicle Department by one Charles Falkenburg, Vice-President of the J. Earl Wilson Construction Company, upon his representation to the Kansas Motor Vehicle Department that the original certificates of title had been lost.

"10. That the first information that plaintiff and defendant had of the issuance of the Kansas duplicate title to said automobile was shortly after April 11, 1957. On that date, the Missouri State Highway Patrol notified Charles S. Crank, Chief of Detectives of the Topeka Police Department that the records of the Missouri Motor Registration Division, Jefferson City, Missouri, reflected that Missouri certificate of title No. 7632598 was issued April 4, 1957, with Missouri license C53-360 to F. M. Grace, 429 West 57th Terrace, Kansas City, Missouri, for a 1953 Buick Riviera, Motor No. V411727, purchased March 14, 1957 from J. Earl Wilson Construction Company, Inc., 123 East 21st Street, Topeka, Kansas, and who surrendered duplicate Kansas title No. 2280408A. A copy of said letter from the Missouri State Highway Patrol is attached hereto and marked Exhibit E.

"11. The said J. Earl Wilson, the named insured, at no time made any report that said automobile was stolen or made any claim to the plaintiff for payment under said insurance policy by reason of theft of said automobile nor did he file any proof of loss.

"12. The defendant applied plaintiff's payment to it in partial satisfaction of J. Earl Wilson's indebtedness and on October 31, 1956, said J. Earl Wilson paid the balance of his indebtedness to the defendant and was released from any further obligation thereon and defendant's chattel mortgage describing said 1953 Buick Riviera automobile was released upon the records of the Register of Deeds, Shawnee County, Kansas, on November 20, 1956.

"13. Subsequent to November 20, 1956, plaintiff made demand on the defendant to repay the sum of $1,390.00 and the defendant then and at all times since has refused to do so.

"It is further stipulated that either party hereto may introduce such other and further testimony as is material, relevant and competent under the issues herein, and that either party may object on any proper and sufficient ground to any of the facts herein above stipulated."

Certain exhibits as indicated *supra* form a part of the stipulation.

The pertinent parts of the insurance policy Exhibit A have been noted. Exhibit B, the report of the theft to the Topeka Police Department merely contains a description of the Buick car supposed to have been stolen.

Exhibit C is the proof of loss signed by defendant company stating that the 1953 Buick automobile had been stolen on the 30th day of March, 1956.

Exhibit D is the "Hold Harmless Agreement" signed by defendant certain paragraphs of which read as follows:

"(B) Agree to save and keep harmless the said NORTH RIVER INSURANCE COMPANY From and against all claims and demands of the named insured or insureds, his (her) heirs, assigns, or any others by virtue of the aforementioned policy insuring certain automobiles:

"(C) Represents that it has exercised its right of foreclosure and/or repossession in full and proper legal manner pursuant to a Conditional Sales Contract or Chattel Mortgage covering the above described automobiles:

"(D) Further agrees to indemnify and keep harmless the said NORTH RIVER INSURANCE COMPANY against all damages, loss, costs, charges and expenses which the said company may sustain, incur or be liable for in consequence of any claims or demands under or by virtue of the above described policy."

Exhibit E is the letter from the Missouri State Highway Patrol to the Topeka Police Department explaining the discovery of the supposedly stolen automobile. The last paragraph of this letter reads:

"It is kindly requested that we be advised whether or not this vehicle has been recovered. The theft is outstanding and it is suggested that the interested parties be notified in order to protect their interests. We will appreciate hearing from you at your convenience. *We will take the necessary steps to effect recovery of the automobile in the event that it was not recovered subsequent to the report of the theft.*" (Italics supplied.)

The only oral testimony offered by either party at the trial was the testimony of Ravert Douglas Clark, who had been the branch manager of the defendant's Topeka office. This witness was produced by the defendant. We believe that a fair summary of the witness' testimony is as follows:

Mr. J. Earl Wilson was released from the state hospital on June 30, 1956. The defendant began negotiations to collect the balance

of the loan. Wilson came to the defendant's office early in September, 1956, and talked with the witness. Wilson seems to have moved to Leavenworth county and the loan was transferred to the defendant's Lansing office. The balance of the loan was paid on October 31, 1956. All that Wilson paid above the $1,390 paid by plaintiff insurance company was the sum of $15.68.

The witness further testified that after the payment of the loan and release of the chattel mortgage, a payment of $295.80 was received by defendant company on a health and accident insurance policy which had also been taken out in connection with the loan by Wilson. This payment was made by the health company because of the illness of Wilson described *supra*. The check from the health insurance company was turned over by defendant to an agent of Wilson.

The witness was cross-examined, concerning any conversation he had with Wilson in September concerning the theft of the automobile. The following statement contains a fair account of his answers to these questions:

"I don't remember talking with Mr. Wilson about how the car was stolen or what he might have known about it. It is possible that I did but it was quite some time ago—I don't recall the exact conversation. I have no recollection of learning that the car was not stolen as a result of that conversation. I would have notified our insurance agent immediately. To the best of my knowledge I don't recall discussing the theft with Mr. Wilson. The only thing I know about the conversation was that we had received the check from the insurance company covering the theft of the car, and what his balance was and we wanted him to pay the balance."

This court will take the above testimony as true.

The trial was completed by a further sitpulation by counsel for the defendant which reads as follows:

"I will stipulate that I would not contend that Mr. Grace was an innocent purchaser or bonafide purchaser. I do not know what happened to it (the car) after he purchased it."

This case is in reality before this court for decision upon the above undisputed facts. The salient features of the above recitation may be said to be: That on April 5, 1956, defendant notified plaintiff of the suspected theft of the automobile. An investigation was made and the whereabouts of the car was not discovered, although it appears to have been in Topeka at all times and in the hands of Wilson's associates. It is to be noted that in Paragraph No. 9 of the stipulated facts, it is agreed that on April 6, 1956, one day after

the notice of theft given by defendant, a duplicate Kansas title was obtained for the automobile in question from the Kansas Motor Vehicle Department by Charles Falkenburg, Vice-President of the J. Earl Wilson Construction Company. Despite the above fact, the plaintiff insurance company paid to defendant on June 18, 1956, the total value of the car upon the signed proof of loss by the defendant. Almost a year later to the day, it was discovered by the parties, that the automobile had not been stolen at all; that it had now been transferred to a purchaser who, in view of the stipulation *supra*, we must treat as not a bona fide or innocent purchaser and thus subject to the lien of the chattel mortgage.

There are some features about this appeal which might indicate that this is regarded as a test case by the parties. Be that as it may, it would seem that the decision of the case must turn upon the first question of whether the defendant owed a duty to the plaintiff to go forward and attempt to secure payment of its loan after it had been paid by a mutual mistake of facts as to an insured loss having occurred. We shall not impute bad faith to either party.

We shall not unduly labor the matter. It has been noted *supra*, that for three hundred years the very basis of an action for money paid under mistake has been that the law will imply a promise to repay the money on discovery of the mistake. This was an equitable principle although applied by the courts of law.

It may be suggested that the forms of action have been abolished (G. S. 1949, 60-201). But it must be true that the theories of the forms of action still rule us, otherwise where do we go to ascertain when we have an action? It would seem unnecessary to cite further authorities upon the nature of the action in general assumpsit but see, 4 Am. Jur. 499, § 10; 7 C. J. S. 113 § 9.

If we find that defendant had a duty to repay plaintiff the money mistakenly paid to defendant, do the above facts show that defendant has so changed its position after receiving the payment that it would be inequitable to compel it to repay the plaintiff the money wrongfully received?

Actually, all the defendant had done before learning that the automobile had not been stolen was to release the chattel mortgage and to pay over to its debtor the sum of $295.80 which it might have applied upon its loan. In our opinion, those matters do not prove that defendant had put itself in a position where it could not with diligence have made itself whole. We again direct attention

to the fact that defendant had and, because of the special nature of this appeal (see *supra*), still has the burden of proof as to its affirmative defense.

Even the defendant does not here claim that it could not have reasserted its mortgage which was released under a mistake of fact. In the case of *Cornwell v. Moss*, 95 Kan. 229, 147 Pac. 824, this court held that a chattel mortgagee could assert the lien of the mortgage which had been released under an inadequate knowledge of the true facts. It has likewise been held that the mistaken release of a real estate mortgage will not prevent the assertion of the lien of the mortgage upon discovery of the mistake, see *Loan Co. v. Garrity*, 57 Kan. 805, 48 Pac. 33, and *Linn v. Ziegler*, 68 Kan. 528 at p. 533, 75 Pac. 489.

Obviously, a *bona fide* purchaser might raise a rather insurmountable difficulty, but in the case at bar, Grace, the purchaser in Missouri, is agreed not to have been such a purchaser and there would appear to be no reason which would have prevented defendant upon notice of the true facts in April, 1957, from moving out and asserting its right to the automobile in question. That automobile worth $1390 a year earlier must still be considered as a valuable asset in April, 1957. The Missouri authorities were ready to advise as to the location of the automobile.

Further, it will be noticed that the defendant's chattel mortgage covered property other than the automobile. Defendant did not show the nature of this property or that it could not have been reached and subjected to the mortgage in 1957. Defendant does not show that J. Earl Wilson was insolvent or unable to repay the loan regardless of security. From all shown by the stipulated facts, Wilson may have been a wealthy man.

Defendant is here asserting an equitable defense to a common law duty as he may do under our code of civil procedure. Certain general text books and collections of cases are cited by defendant as to the use of the defense of change of position in an action for money paid under mistake. Defendant has cited no case nor have we found one in the books cited, which presents the question in the case at bar. Under the facts, in our opinion it would be inequitable for such a defense to be approved in this case when from all that is shown, defendant could have acted promptly and made itself whole.

The judgment appealed from must be reversed with directions to enter judgment for the plaintiff.

It is so ordered.