No. 47,198

BEVERLY J. RECTOR, *Plaintiff-Appellee*, v. CHARLES B. HUSTED, *Defendant-Appellee*, and ST. PAUL INSURANCE COMPANIES, *Garnishee-Appellant*.

(519 P. 2d 634)

Opinion filed March 2, 1974.

*Myron L. Listrom*, of Sloan, Listrom, Eisenbarth, Sloan and Glassman, of Topeka, argued the cause and was on the brief for the appellant.

*James E. Benfer,* of Fisher & Benfer, Chartered, of Topeka, argued the cause, and *Charles S. Fisher, Jr.,* and *Robert D. Ochs,* of the same firm, were on the brief for the appellee, Beverly J. Rector.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in a garnishment action wherein the plaintiff recovered a judgment against an insurance carrier for that portion of the plaintiff's judgment in excess of policy limits.

Beverly J. Rector (plaintiff-appellee) recovered a judgment for $12,500 against Charles B. Husted (defendant-appellee). Husted's insurer, St. Paul Insurance Companies (appellant) defended the case under the obligations of its policy. After the jury returned its verdict for plaintiff, an order of garnishment was issued against the insurer. The insurer answered that it was holding $9,624.65 for the defendant. On October 11, 1971, the plaintiff was paid $9,624.65 as partial satisfaction of the judgment against the defendant. The plaintiff took exception to the garnishee's answer and a garnishment hearing was held in the district court of Shawnee County, Kansas, on the issue of whether or not the garnishee-insurer was negligent or acted in bad faith in defending its insured under its policy. The trial court determined the garnishee-insurer had been both negligent and acted in bad faith in conducting the defense, and entered judgment against it for the entire amount of the judgment. Appeal has been duly perfected by the garnishee-insurer.

The facts giving rise to this proceeding are disclosed by depositions, exhibits and stipulations set forth in the record.

On November 14, 1968, Beverly J. Rector, a legal secretary 32 years of age, was driving to work on Fifth Street which is a one way through street. At the intersection of Fifth Street and Buchanan her automobile was struck by a vehicle driven by Charles B. Husted, who was traveling south on Buchanan. Husted had failed to stop at the designated stop sign at Fifth and Buchanan. The plaintiff's vehicle was spun half-way around, and she sustained a bump on her forehead. She got out of the car unassisted and walked across the street to telephone her place of employment. She then went back to the accident scene and remained for about 30 minutes before continuing on her way to work. She did not think she was injured except for the bump on her head, but later in the day her neck and back began hurting. She remained on the job all day.

The plaintiff has experienced pain in her lower back since the accident. Prior to the accident she never had any back trouble and had led a physically active life. As a result of her back discomfort she has curtailed many of her activities. She continues to feel pain when she performs household tasks like ironing, washing, and going up and down the stairs. When her back begins to hurt she takes pain pills, and soaks her back when that is possible.

She did not lose any wages as a result of the accident, and reported for work every day. She would try to take some time to rest in the afternoons.

On May 29, 1969, the plaintiff was in her automobile when it was struck from the rear by another vehicle. She denied being injured in this accident, and did not advise her doctors of it. In reporting the accident to the motor vehicle department she listed damage to her car as $400 and injuries as "unknown".

The plaintiff following her first accident consulted with two doctors concerning her condition.

Dr. Joyce, an orthopedic surgeon from Topeka, Kansas, saw the plaintiff from June 27, 1969, to July 28, 1971. Throughout this period of time the plaintiff continually complained to him of discomfort in her lower back region, though she did state on one occasion that she felt she was improving.

Dr. Joyce testified that X-rays did not reveal any injury to the lumbosacral area, but that ligamentis injuries to the lower back are difficult to see on an X-ray.

Dr. Joyce's diagnosis of the plaintiff was that she suffered a minimal permanent partial disability relative to the lower back. He explained that with a minimal type of disability a person experiences discomfort in the lower back at the end of a day in which she has done a lot of stooping or bending. The doctor used the term permanent to mean that the plaintiff will be faced with some discomfort in her back the rest of her life, not necessarily 24 hours a day, but only after doing a lot of stooping or bending.

Dr. Pusitz is a physician practicing in Topeka, Kansas, and specializing in orthopedic surgery. Dr. Pusitz examined the plaintiff on numerous occasions from November 20, 1968, until April 24, 1969. His initial examination disclosed a tenderness over her cervical spine and marked tenderness over both upper trapezii (two large muscles on each side of and extending all the way down the spine). His specific diagnosis was that the plaintiff has a sprain of the cervical spine, fibrositis of both upper trapezii with trigger

points and a sacroiliac strain. In his opinion, the plaintiff's condition was the result of the November 1968, accident. His diagnosis was based on objective signs of injury rather than plaintiff's subjective complaints.

Dr. Pusitz placed the plaintiff in physiotherapy and muscle education sessions. He last examined her on April 24, 1969, and discharged her at that time with marked improvement; however, she still had certain disability which he described as permanent.

Dr. John Lynch, an orthopedic surgeon practicing in Topeka, Kansas, examined the plaintiff on April 21, 1971, at the appellant's request. He testified he could not find any objective signs of permanent disability to plaintiff's back. No abnormalities relating to the lower spine were detected by either X-rays or a neurological examination. He stated that the plaintiff had symptoms related to low back strain which in his experience was not unusual despite the absence of objective findings. He concluded plaintiff's condition was relatively minor and expected the symptoms to be resolved.

On cross-examination the doctor stated he did not mean by his testimony that the plaintiff did not suffer injury from the November, 1968, accident, and that her symptoms were consistent with injuries which could have occurred in an automobile accident. Also, it was his opinion the plaintiff was cooperative, straight forward and not malingering or overstating her claim.

The parties stipulated to the testimony of two witnesses: Myron L. Listrom, the attorney retained by the appellant to do the trial work, and Larry P. Schell, formerly a claims representative for the appellant who handled the plaintiff's claim.

The stipulation recites that if Listrom were called to testify he would have testified as follows:

"a. That he advised the Defendant during the course of the trial that Plaintiff would settle the case for $6,000.00 but that neither the Garnishee (insurer) nor Myron L. Listrom, their attorney, thought the case was worth that much. The Defendant made no response.

"b. That during the course of the trial, Myron L. Listrom discussed again with the Defendant that he, the Defendant, would be liable for any verdict in excess of $10,000.00 and the Defendant acknowledged that he was aware of this because of the letter he received from Myron L. Listrom bearing the date of September 2, 1970.

"c. [Letter dated September 2, 1970, from Listrom to Husted explaining that Listrom would represent the insurance company and Husted in the suit up to the $10,000.00 coverage, and that Husted would be personally liable

for any amount exceeding $10,000.00 and suggesting Husted might want to retain counsel of his own.]

"d. [Husted's reply indicating he understood Listrom's letter and would not retain his own counsel.]

"e. That at no time during the pendency of the litigation, nor during the course of the trial was the Defendant ever notified that the Garnishee (insurer) could be liable for a verdict in excess of the policy limits for negligence in handling the case or for failure to exercise good faith in the handling of the defense of the case, nor was that subject ever discussed with defendant."

Essentially, Schell's testimony was that at one time he offered plaintiff's attorney $3,000 to settle the case (in addition to any medical or property damage), and that plaintiff's attorney replied that he could not and would not discuss a settlement with anyone other than the attorney of record for the insurance carrier, Myron Listrom.

A deposition was taken from Raymond O. Zweifel, the claims manager for the appellant. Zweifel had primary responsibility for the disposition of plaintiff's claim from the time it was made through the trial proceedings.

He related that after an investigation into the November, 1968, accident he determined Husted was liable for the damages because he negligently failed to stop at the stop sign. *It was never the insurance company's position that they could escape liability.* The controversy between the parties was the amount of damages caused by the accident.

The plaintiff's attorney forwarded all medical bills, drug bills, and reports of Dr. Pusitz and Dr. Joyce to the appellant. The appellant paid the medical and drug bills as they were received. The parties stipulated that plaintiff's medical expense totaled $655.72. The appellant also paid appellee $382.50 as the fair market value of her automobile, since it was a total loss as a result of the collision.

Appellant employed an investigator to follow the claimant and keep track of her activities. Despite the fact that he followed her for quite a long time he was unable to find any information suitable as evidence.

Mr. Zweifel testified that originally the reserve established for this case was $2,500 for bodily injury and $400 on property damage. On October 27, 1969, the bodily injury reserve was increased to $5,000. It was thereafter raised to $7,500. It was within his discretion to settle the case up to the $7,500 limit. The only explanation made by Zweifel concerning why the reserve was ultimately set at

$7,500 is not particularly enlightening. He stated he did not establish that amount of reserve because he thought the claimant was entitled to it, but on the basis of what the insurance company might pay.

Sometime after the $7,500 reserve limit was established, the appellant learned the plaintiff had been involved in a rear-end accident subsequent to the November 14, 1968, collision. Zweifel felt this fact mitigated plaintiff's claim for damages, and testified company policy prevented him from reducing the $7,500 reserve limit after learning about the second collision.

When the appellant went to trial its theory of defense was that they would surprise the plaintiff with the second automobile accident, information obtained from the investigation, and the fact that Dr. Lynch would testify there were no objective indications of a back disorder in the plaintiff.

Also contained in Zweifel's file concerning the case was the first suit report from Myron L. Listrom, their attorney. The following questions and answers are contained in that report.

\* \* \* \* \*

"9. What do you believe its [plaintiff's case] settlement value is now? $9,000.00

"10. Can it be settled now at that figure? probably

"11. Do you believe we should settle? no Why? amount claimed is excessive

"12. What do you recommend in settlement at the present time? $3,000.00 at most

"13. What reserve do you recommend we carry? $5,000.00

"14. What are our chances of winning the trial? __Fair __Good xx Poor

"15. In the event this case was tried and lost what do you believe the probable range of the verdict would be? $3,000.00—$4,000.00 at most

"16. If tried, what would be the approximate cost of defense? $750.00-$1,000.00

"17. Any further recommendations or comments   recommend examination of Plaintiff by a neutral physician"

Mr. Zweifel's file concerning appellee's claim indicated the claims adjustor had made a $1,000 settlement offer to appellee's attorney prior to the filing of the suit. Mr. Zweifel stated he was aware of the fact that no offer had been made at any time to plaintiff's attorney *by the appellant's attorney,* so that there was no offer outstanding to be accepted by the plaintiff.

The parties stipulated:

" 'Through the time the verdict came in at no time was there ever an offer made to settle the case for any amount of money by the defendant to the

plaintiff although there was a conversation at one stage that the plaintiff offered to take $6,000.00 on the record and the defendants' attorney stated that if plaintiff was interested he would see if he could get $3,000.00 authority.'

" 'The plaintiff, by her attorney, advised defendant on the record during the trial that they were going to look to the garnishee for any part of the verdict in excess of $10,000.00.' "

Mr. Zweifel testified he and Listrom jointly discussed the plaintiff's $6,000 settlement offer and decided not to accept it. The following testimony was given by Zweifel regarding that decision:

"Q. And you elected to take your chances with the jury?
"A. Right, sir.
"Q. Is that a fair statement?
"A. That's a fair statement. Yes, sir."

Mr. Zweifel further testified he was aware of the appellant's obligation to its insured to use ordinary care in the handling of the loss and to protect the insured's interests as well as the company's. He thought he gave equal consideration to the interests of both the company and the insured.

Mr. Zweifel had authority at every stage of the proceeding to settle the plaintiff's case for any amount up to the reserve limit. When Mr. Zweifel made the decision not to offer to settle the case, and to refuse plaintiff's offer, he was aware of all the information in his file; that the jury's verdict for the plaintiff would include medical expenses, damages for pain and suffering, mental anguish, permanent disability; and that the jury would take into consideration plaintiff's 44½ years life expectancy.

Trial was to the court and the journal entry recites the following:

"The Court makes the following findings of fact:

"1. Plaintiff offered to accept $6,000.00 and made this offer on the record during the trial. St. Paul failed to act or respond by way of any counter offer.

"2. Defendant's insurer was aware that he was at fault for running a stop sign. It was fully informed as to the nature of plaintiff's injuries, treatment and medical expenses incurred.

"3. The original reserve for bodily injury was set at $2,500.00 by St. Paul, and eventually it was increased to $7,500.00 on a coverage limit of $10,000.00. St. Paul was aware that plaintiff was claiming permanent injuries and medical evidence supported this.

"4. Defendant admitted liability in the trial. St. Paul agreed that liability should be admitted. The investigation by St. Paul showed no contributory negligence on plaintiff's part.

"5. Defendant's and St. Paul's counsel, Mr. Listrom, submitted an attorney's first suit report (Defendant's exhibit 2) and to the questions 9-14, the following answers were provided.

[Same as previously quoted]

"6. The only bona fide offer made by St. Paul was $1,000.00. An offer was made by Larry P. Schell, claims representative for St. Paul, to plaintiff's counsel after suit was filed in the amount of $3,000.00 in addition to medicals and property damage. Since Mr. Listrom appeared as counsel of record for the defendant (and garnishee) Mr. Fisher would not discuss the matter with the representative. At no time has defendant's counsel made any offer of this amount.

"7. The defendant was informed by Mr. Listrom of his obligation and risk in the event of an excess judgment and further informed defendant of the plaintiff's offer to settle for $6,000.00.

"The Court makes the following conclusions of law:

"1. The insurer, St. Paul breached its duty to exercise good faith when it refused to discuss the compromise offer other than the only bona fide offer of $1,000.00.

"2. The insurer had a duty to the insured to make a reasonable attempt to settle the case. A refusal to consider any offer other than the $1,000.00 was negligent and in bad faith.

"3. The fact that the insurer makes the insured aware of the risk involved in the event of an excess and informs the insured of the offer made by the plaintiff does not negate the responsibility of the insured to make a good faith attempt to settle the case within the policy limits.

"4. In this case the insurer anticipated that the verdict could be as high as $7,500.00 judging upon its reserve and the opinion of counsel in his first report indicated a claim worth in excess of the $1,000.00 offer made.

"IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED AND DECREED, BY THE COURT, that judgment is entered in favor of the plaintiff against the garnishee, St. Paul Insurance Companies, for the total amount of the judgment, the sum of $12,500.00 and costs less a credit for the amount previously paid in a sum of $10,000.00."

Though the insurance policy is not included in the record, we are told it was a standard-type liability policy reserving to the insurer the right to make an investigation and settlement of any claim or suit as it deemed expedient. Under such a policy, the insurer is obligated to defend any action against the insured.

This court has had occasion previously to consider the duty of an insurer in defending and settling claims against its insured. (*Anderson v. Surety Co.*, 107 Kan. 375, 191 Pac. 583; 21 A. L. R. 761; *Bennett v. Conrady*, 180 Kan. 485, 305 P. 2d 823; *Bollinger v. Nuss*, 202 Kan. 326, 449 P. 2d 502.) In *Bolinger*, supra, the court thoroughly examined this area of the law. The applicable rules will be reiterated in this opinion; however, for a more comprehensive discussion the reader is referred to *Bollinger*, supra, and the authorities cited therein. Both parties agree the law set forth in *Bollinger* controls

the decision herein. They disagree on the application of the law to the facts.

It is universally recognized that the insurer owes a duty to its insured when considering a settlement or compromise of a claim against the insured. (See, Ann. 40 A. L. R. 2d 168.) Traditionally, two theories, the "negligence theory" and the "good faith theory", have been utilized by courts to define the insurer's scope of liability. It is clear in Kansas an insurer, in defending and settling claims against its insured, owes a duty to the insured not only to act in good faith but also to act without negligence.

The focal point from which a decision on the facts in a case such as this must be made is well stated in *Bollinger v. Nuss*, supra, as follows:

"The provisions of the policy requiring the insurer to defend also encompass the negotiation of any settlement prior to trial. When a claim is made against the insured for an amount in excess of the policy coverage, the insurer's obligation to defend creates a conflict of interests on its part. On the one hand, its interests lie in minimizing the amount to be paid; on the other, the insured's interests, which the insurer is supposedly defending, lie in keeping recovery within policy limits, so that he will suffer no personal financial loss. The conflict becomes particularly acute where there is an offer of settlement approximating policy limits. The insured's desire to avoid the risk of a large judgment by settling within the limits of the policy, regardless of the merits of the claim, would compel him, were he in charge of settlement negotiations, to accept the offer. The insurer's interests, on the other hand, are prompted by its own evaluation of the liability aspects of the litigation and a desire not to expose itself to payments which do not adequately reflect the dangers that might be involved in pursuing the case to trial. When the settlement offer approaches policy limits, the insurer has a great deal less to risk from going to trial than does the insured, because the extent of its potential liability is fixed." (p. 336.)

In speaking of the foregoing conflict of interest the court said in *Bennett v. Conrady*, supra:

". . . Because of the aforementioned conflict of interest where an insurer defends the action or settles the claims against its insured, there is a mutual fiduciary relationship between the parties equal to that of a principal and agent relationship whereby each owes the other the duty to exercise reasonable care in conducting the defense or settlement. . . ." (p. 490.)

The court recognized in *Bollinger* that the dichotomy developed in the early cases, depending on whether the insurer's obligation was measured by good faith or due care, has tended to dissipate. It was recognized in both *Bennett v. Conrady*, supra, and in the *Bollinger* case that the two tests have tended to coalesce.

The obligation of the insurer under circumstances here presented is spelled out more particularly in the *Bollinger* case in the following language:

"Notwithstanding that the typical liability insurance policy completely subordinates the insured's interests to those of the insurer by a clause giving the insurer full settlement rights, the insurer has a duty to consider the interests of the insured in all settlement negotiations. Whether the conduct of the insurer is measured by good faith or ordinary care, the real question is the degree of consideration which an insurer must give to those interests of the insured which conflict with its own. Although the decisions run the gamut from the extreme, that the insurer is entitled to regard its own interests as paramount, to the opposite, that the insured's interest must be given priority (Anno. 40 A. L. R. 2d 168 § 5), we are inclined to the view that the insurer may properly give consideration to its own interests, but it must also give at least equal consideration to the interests of the insured." (p. 336.)

This rule of equal consideration means the claim should be evaluated by the insurer without looking to the policy limits and as though it alone would be responsible for the payment of any judgment rendered on the claim. (*Bollinger*, supra, p. 337.)

As noted in *Bollinger*, supra, the insurer's conduct must not be viewed through hindsight, but rather as the case fairly appeared to the insurer and its authorized agents and attorneys during the time the case was under construction. It is stated in *Bollinger*, supra:

". . . Something more than mere error of judgment is necessary to constitute bad faith. The company cannot be required to predict with exactitude the results of a trial; nor does the company act in bad faith where it honestly believes, and has cause to believe, that any probable liability will be less than policy limits. . . ." (p. 341.)

The primary contention of the appellant in the points assigned for review is that the trial court erred in finding that the appellant "*had breached its duty to exercise good faith* when it refused to discuss the compromise offer of plaintiff made at the trial or to make any counter offer other than the bona fide offer of $1,000", and "*was negligent and acted in bad faith* in refusing to consider any offer other than the $1,000."

Whether an insurer in defending a claim or in refusing an offer of settlement within policy limits was negligent or acted in bad faith is a question for the trier of fact in each case (*Bollinger v. Nuss*, supra, and authorities cited therein). Where an insurance company acts honestly and in good faith upon adequate information, it should not be held liable because it failed to prophesy the result.

The appellant argues that while it has admitted liability, the ex-

tent of the plaintiff's injuries were not so clear. It is on this point that the appellant takes issue with the trial court's finding that it was negligent and acted in bad faith toward its insured. The appellant argues the plaintiff was never hospitalized and never lost a day of work. She went to two orthopedic doctors and incurred medical expense of $486.67 to the date of filing suit in August 1970. In addition she had spent a total of $169.45 for prescriptions. This was the total of the plaintiff's "out of pocket" expenses from the date of the accident, November 14, 1968, to the date of trial. She did not see a doctor until six days after the accident. She was subsequently involved in a rear-end accident on May 29, 1969, causing an estimated $400 damages to her automobile. She indicated her injuries as "unknown". She did not report this accident to either of her doctors. Her two doctors testified that she had some permanent partial disability to the back, but only one of them could find objective signs of these injuries, Dr. M. E. Pusitz. The appellant had the plaintiff examined by Dr. John Lynch who could find no permanent injury to plaintiff.

Under these circumstances the appellant contends it was not negligent and did not act in bad faith because it wanted the jury to determine the extent and character of plaintiff's injuries.

The appellant further argues that the plaintiff was willing to settle for $6,000 after all of the plaintiff's evidence was presented; and that if this is all counsel for plaintiff thought his case was worth, the risk taken by going to the jury did not indicate bad faith on its part. This settlement offer it is argued was well within the policy limits. So actually the appellant was gambling $4,000 (the remainder of the coverage) against $2,500 (the amount of excess verdict) risk to the insured. Looking at it in this light it is argued the appellant had more to lose.

The nature of the case makes it clear that it was unquestionably worth more than $1,000, the amount of appellants only bona fide offer. The case involved admitted liability of the insured. There is also the testimony of two orthopedic surgeons that plaintiff has a permanent disability. While appellant's doctor found no objective signs of permanent injury, he was equivocal as to plaintiff's injuries. It was stipulated plaintiff had 44½ years of life expectancy. It is equally plain that appellant, through its authorized agents and representatives valued the case in excess of their $1,000 settlement offer. This is indicated by: (1) The first suit report dated August

28, 1970, by the appellant's trial attorney which reflects that he believed the settlement value of plaintiff's claim at that time was $9,000; however, he believed that amount was excessive and recommended a settlement at that time of $3,000 at the most. He recommended a reserve (which we understand to mean the amount allocated by the insurance company for a particular claim) should be $5,000, and approximated the cost of defense in event the case was tried at $750 to $1,000; (2) Sometime in November of 1969 appellant's claims manager established a reserve for plaintiff's claim at $7,500; and (3) It also appears that appellant's claims representative at one time offered to settle the claim for $3,000, though plaintiff's attorney refused to negotiate because there was an attorney of record for the appellant and the insured at that time.

There is no evidence in the record to justify any significant revaluation of plaintiff's claim due to the second accident. The rear-end collision occurred some six months subsequent to the accident with the insured. Plaintiff testified she was not injured in it and her accident report corroborates this. The doctors did not testify to any change in plaintiff's condition around the time of her second accident.

We think the foregoing evidence is sufficient to sustain the court's finding that the appellant breached its duty to exercise good faith and due care in refusing to negotiate with plaintiff for a settlement beyond their only bona fide offer of $1,000. The mutual fiduciary relationship of the insurer and the insured imposes a duty upon the insurer to make reasonable efforts to negotiate a settlement of a claim against the insured. The appellant, whose agents were cognizant of the evidence in this case, did not give fair consideration to the insured's position when they elected to take their chances with the jury without reasonably attempting to negotiate a settlement.

This is not to say the appellant was required under the circumstances to settle this claim for $6,000; rather, we believe it was incumbent upon the appellant, with a claim involving admitted liability and permanent disability, to make a good faith attempt at negotiating a settlement. By taking a chance with the jury the appellant was exposing the insured to potential personal liability for an amount well above the policy limits. The action filed by the plaintiff sought damages in the amount of $25,000. Fair and equal consideration of the insured's vulnerable position demands that

reasonable attempts be made to protect him from such exposure. While the appellant in this case responded to the plaintiff's claim by setting aside $7,500 in its reserve for bodily injury ($2,500 within the policy limits), it was impossible to predict with any accuracy the results of a trial, and for this very reason the insurer should have made reasonable efforts to keep the case from consideration of the jury.

Under all of the facts and circumstances presented by the record in this case we think the trial court was justified in construing the appellant's one bona fide offer of $1,000 to settle the case as insufficient to fulfill its duty to the insured.

The judgment of the lower court is affirmed.

FROMME, J., dissenting: Disagreement with the opinion of the court prompts the following explanation. The decision as written will place an intolerable burden on counsel for insurance companies who attempt in good faith to protect both the interest of the company and the insured against claims of third parties. This court for the first time indicates that a company has a duty to initiate a "reasonable" offer of settlement when its insured is about to be sued by an injured third party. In addition the thrust of the opinion seems to impose upon counsel for the company the impossible task of forecasting at his peril the future amount of a jury verdict while engaged in the trial of the lawsuit.

You must look beyond the syllabus of the court in this case to understand what the case holds. Innocently enough every paragraph of the syllabus indicates, by the use of parenthesis, that the holding finds support in our prior case of *Bollinger v. Nuss,* supra. But an examination of *Bolinger* indicates two very surprising things. The facts in *Bollinger* make a much stronger case to establish negligence or bad faith yet the company was not held responsible for an excess. For instance the company refused an offer of settlement made by the injured third party of $23,500.00. The offer was made before trial and the policy limit was $25,000.00. The verdict of the jury was $30,483.84. Thus the company gambled $1,500.00 and its insured had to pay $5,483.84 as a result of the gamble.

The second thing which should be noted about *Bollinger* is that the rules of law stated are based upon the supposition that the injured third party has intiated an offer of settlement. The opinion in the present case is a distinct departure from the holding in *Bollinger* and from our prior case law in this area.

Previously we have held that there may be a conflict of interest between the insurer and the insured. Out of this possible conflict of interest arises a duty to the insured. Failure to fulfill that duty creates a liability which may extend beyond the limits of the policy. In *Bollinger* where the offer was $23,500.00 with a policy limit of $25,000.00 this court noted that the question of liability beyond the policy limit "becomes particularly acute where there is an offer of settlement approximating policy limits." (202 Kan. p. 336.) This court in denying liability for the excess verdict in *Bollinger* says:

". . . [W]e are inclined to the view that the insurer may properly give consideration to its own interests, but it must also give at least equal consideration to the interests of the insured." (202 Kan. p. 336.)

Assuming that this is a valid premise, what unequal consideration appears in the present case? The company lost $4,000.00 by refusing the offer of settlement during trial and the insured should have lost $2,500.00 which is the excess over policy limits

The opinion in the present case attaches considerable significance to the amount of reserves established by the company to take care of possible future liability. This is not a proper criterion. If such is proper a conservative company which wishes to adequately protect against all possible losses will be penalized. Internal policies of the company have little or nothing to do with negligence or bad faith in considering offers of settlement in the field. Could it be argued that the establishment of a small reserve by the company indicates less liability and less duty to consider a reasonable offer of settlement made in good faith? I think not.

Some weight is given in the opinion to evidence that the company initiated an offer of settlement before trial of only $1,000.00, when the ultimate liability established by the verdict was $12,500.00. It should be noted in this regard that the offer was refused and the injured party made no counter offer prior to trial.

As I read *Bollinger* and the other cases cited in the court's opinion the obligation of the company arises when it receives an offer of settlement from the injured third party. This is confirmed by reading paragraphs 2, 3 and 4 of the syllabus which are lifted from *Bollinger*. These paragraphs refer to *considering* (¶ 2), *rejecting* (¶ 3) or *refusing* (¶ 4) *offers of settlement initiated by the injured third party*. This important fact is overlooked in the majority opinion, and as a result the opinion as written will

impose a duty on a company to initiate an offer of settlement not required by its contract of insurance and prior case law. This duty to initiate an offer of settlement is not recognized in any of our prior cases.

Again may I point out the company did make an offer of $1,000.00 to settle the case before trial. The injured party did not respond to that offer until after the trial had begun in court. During the heat of the trial the injured party offered to settle for $6,000.00 and at that time, as shown by the stipulation of the parties, the company made a counter offer of $3,000.00. Whether this counter offer came from a claims agent or the company attorney seems immaterial. This counter offer was entirely in line with the attorney's previous evaluation of liability.

The trial court erroneously found that the company refused to discuss the offer made at the trial or to make a counter offer *other than the bona fide offer of* $1,000.00. The parties stipulated otherwise as shown on page 235 (p. 8) of the majority opinion.

The $3,000.00 counter offer was ignored by the plaintiff. In addition it should be remembered that while plaintiff's offer was $6,000.00 the policy limit was $10,000.00 and contained a seemingly adequate cushion to protect the insured. From hindsight we can say the $6,000.00 offer should have been accepted by the company. In view of the verdict returned it is now easy to see that both the company and the insured would have benefited by an acceptance. But hindsight cannot be used to arrive at a proper decision in these cases. In *Bollinger* it is said:

". . . The strength of plaintiff's case must be gauged as it appeared at the time the offer was refused. As all can now see through hindsight, it would have been better for both the insured and the insurer to have accepted the offer. . . . The value of an unlitigated claim must be determined on its own apparent merits, or lack of them, the possibility of liability being established, and on the injuries and their extent being proven. . . ." (202 pp. 340, 341.)

Again we wish to note, it is the refusal of an offer made by the injured third party which imposes a duty on the company. When the offer is made the company must then consider the possible consequences both to itself and to its insured. When the offer was made in the present case a trial was in progress. There should be no question that at this time it was doubtful recovery would exceed the policy limit of $10,000.00. The plaintiff's own evaluation of his case was $4,000.00 under this policy limit. In

evaluating the $6,000.00 offer under the circumstances the possibility of an excess verdict was questionable at best.

It is not contended in this case that the company was negligent in the quality of the defense given the insured, as was the situation in *Anderson v. Surety Co.,* supra. Here there was no failure to present every possible defense to the action. The insured was fully advised of his possible liability. He rejected the company's suggestion to hire his own attorney. He never asked the company to negotiate a settlement within the policy limits. In addition it is not contended that the company was guilty of the type of bad faith charged but not established in *Bennett v. Conrady,* supra. There was no evidence the company acted without an adequate investigation of the facts of the case.

In *Bollinger* we say:

".  .  . Where the insurance company acts honestly and in good faith upon adequate information, it should not be held liable because it failed to prophesy the result. [Citation omitted.] Something more than mere error of judgment is necessary to constitute bad faith. The company cannot be required to predict with exactitude the results of a trial; nor does the company act in bad faith where it honestly believes, and has cause to believe, that any probable liability will be less than policy limits. [Citations omitted.] Good faith on the part of the insurer implies honesty, fair dealing and adequate information. [Citation omitted.]" (202 p. 341.)

Now in the present case what was the apparent extent of liability for plaintiff's injuries prior to the trial?

Plaintiff's car had been hit in the left rear portion and had been knocked sidewise. Plaintiff got out of her car unassisted and walked across the street to telephone her employer. She had a bump on her forehead which left no permanent scar. She returned to the accident scene and remained for 30 minutes, then went to work. She remained at work all day. She lost no wages nor was she hospitalized following the accident. She was examined by several doctors in connection with subjective complaints of pain in her back. X-rays disclosed no objective injury. Her injuries were described as amounting to a minimal type of muscle strain and as a sprain of the cervical spine. One doctor stated that after physiotherapy and muscle education sessions covering a five month period she was discharged with marked improvement. The expense for all treatments totaled $655.72.

In addition to these facts the company was advised that plaintiff had been in a subsequent rear-end collision. It was entirely pos-

sible that her subjective complaints may have partially resulted from this unrelated accident.

The present garnishment action was tried to the court without a jury. The trial court found negligence and bad faith. We are well aware of the rule that whether an insurer in defending a claim and refusing an offer of settlement within policy limits was negligent or acted in bad faith is a question for the trier of fact in each case. (*Bollinger v. Nuss*, supra, p. 341.) The facts upon which the trial court rendered its decision were disclosed by depositions, exhibits and stipulations set forth in the record. This court is in as favorable a position to consider this evidence as the trial court. (*North River Ins. Co. v. Aetna Finance Co.*, 186 Kan. 758, Syl. ¶ 1, 352 P. 2d 1060.)

In the present case the trial court's findings are contrary to the facts stipulated by the parties. A counter offer of $3,000.00 was made by the company in response to the $6,000.00 offer. The attorneys for the injured party refused to consider the $3,000.00 counter offer. Furthermore the trial court erroneously construed our holding in *Bollinger v. Nuss*, supra, to require the company to initiate offers of settlement. The company's liability for excess in these cases arises only in case of a breach of duty. A breach of duty occurs only when the company refuses to fairly consider and discuss, or rejects a settlement offer originating with the injured party. In the present case there was no evidence which would amount to negligence or bad faith. At most a mere error of judgment was shown. The majority opinion in affirming the trial court goes beyond our previous decisions and will require an insurance company to initiate an offer of settlement which can be considered reasonable in light of any subsequent verdict. This is an unjust and intolerable burden, even for an insurance company.

The company has paid the amount of its policy limits. The additional judgment against the company for $2,500.00 should be reversed.

FONTRON and OWSLEY, J. J., join in the foregoing dissenting opinion.