**Michelle WILLIAMS, Plaintiff,**

v.

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Defendant.**

**No. 99–1486–JTM.**

United States District Court, D. Kansas.

June 5, 2000.

William J. Fitzpatrick, Fitzpatrick & Bass, Independence, KS, for plaintiff.

Susan P. Selvidge, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, for defendant.

## MEMORANDUM ORDER

MARTEN, District Judge.

This is an action by plaintiff Michelle Williams against an insurer, American Family Mutual Insurance Co., for a bad faith refusal to settle her claim against American's insured. The plaintiff Williams was injured in an automobile accident caused by the insured, who was killed in the accident. Williams is also an assignee of the estate of the insured. American has filed a motion to dismiss which raises a series of defenses. For the reasons stated herein, the court will grant the defendant's motion.

### Facts

The general underlying facts are not the subject of serious dispute. On May 17, 1997, Mary Gilstrap, driving south on Overlook Street in Coffeyville, Kansas, pulled out from a stop sign and into the path of a westbound vehicle driven by Gordon R. Williams. The vehicles collided, killing Gilstrap. A Motor Vehicle Accident Report prepared at the time indicates injuries only to Gilstrap. A few days after the accident, plaintiff Michelle Williams, the wife of Gordon and a passenger in his vehicle, visited her doctor, Dr. Greg Fortner (on a visit scheduled before the accident). Williams was 35 years old at the time of the accident. She complained of sore muscles and back pain.

Several weeks later, Williams complained of additional pain. She was seen by Dr. Andrew C. John, who found that she had a torn disk at L5–S1. Dr. John also concluded that Williams had "[m]arked symptom magnification" which made it very difficult to provide an accurate diagnosis. (Def. Exh. at A000154.)

He also noted significant differences between what Williams had originally told Dr. Fortner (she was "hurting a little") and what she was now telling him (she had been suffering severe pain two days after the accident). Id. Finally, he expressed doubt that the pain claimed by Williams would have manifested itself several weeks after the accident. Williams had had a normal spinal X-ray on May 22, and an MRI on July 9 reported a "[m]ild degenerative disk signal and mild disk bulging at L5–S1," but that "[n]o significant abnormality is detected." (Def. Reply Exh. at A000458, A000446).

A discograph was taken on March 5, 1998, and the results were reviewed by Dr. Scott Anthony, who opined that Williams was experiencing a chemical irritation—rather than a mechanical compression—of the nerve roots at the L5–S1 level. Another doctor, Dr. Mark Hayes, concluded that Williams had "an internally disrupted disc with an annular tear" and recommended surgery. (Plf. Exh. at A000242). On April 22, 1998, Williams had a lumbar laminectomy and interbody fusion.

In a supplemental report in April of 1998, Dr. John concluded at that time that she had a "pre-existing degenerative disease" at the L5–S1 level. (Id. at A000160.) Two years prior to the accident, Williams had been seen by Dr. Fortner, who stated that Williams had back problems "off & on since about 8 years ago when she hurt it" and that she "had bulging disc at that time apparently." (Def. Exh. at A000375).

Defendant American Family provided $100,000 per person liability coverage to Gilstrap at the time of the accident. American Family tried to contract Gilstrap's husband Ray, but learned from a son that Ray Gilstrap was in a nursing home and unable to communicate. The heirs did not open an estate for Mary Gilstrap.

American Family initially assigned the Gilstrap accident to Shawn Conner, a Casualty Claim Examiner for the company. On August 14, 1997, the claim was as-

signed to Melissa Gates when Conner moved to a new position. Gates was responsible for the file until Williams filed suit against the Gilstrap estate in November of 1999.

American Family offered $66,000 to settle Williams's claims on September 24, 1998. Williams told Gates that she planned to have another surgery in November to remove pedicle screws inserted in the first surgery. After the second surgery, on January 5, 1999, American Family offered $81,000 in settlement.

Williams hired attorney Jack Goree, who wrote to American Family on February 8, 1999, offering to settle for $100,000. Goree wrote that "[t]he medical specials are now $96,263.15 and there will be a claim for lost wages as well." (Def. Exh. at A000100).

Gates responded in a letter dated February 11, 1999 that she did not have documentation of $96,263.15 in medical specials, but only about $50,400. She requested copies of additional medical bills, and renewed the offer to settle for $81,000. It is uncontroverted that neither Williams nor her attorneys responded to the request for copies of medical bills prior to filing suit. The plaintiff concedes that Goree was "mistaken" in his reference to $96,263.15 in specials. (Resp. at 4).

Williams hired a new attorney, William Fitzpatrick, who wrote to American Family on March 19, 1999. Fitzpatrick noted both Goree's prior (February 8) offer to settle for policy limits, and American Family's (February 11) response offer of $81,000 and request for documentation. Fitzpatrick made a "final offer to settle this matter for the policy limits" of $100,000. (Def.Exh. A000093). Fitzpatrick did not offer any additional copies of medical bills.

On March 25, Gates responded by stating that the company had reviewed Williams's claims, stood by its offer of $81,000, but would not offer policy limits "at this time." (Id. at A000092).

As noted earlier, Gilstrap's heirs did not open an estate. However, Williams petitioned the Montgomery County, Kansas District Court, pursuant to KSA 59–2239(2), 59–710, and 59–2238 for appointment of a special administrator to accept all civil process. On May 6, 1999, Julia D. Allen was appointed Special Administrator and was issued Letters of Special Administration authorizing her to accept all civil process and represent the interests of the Estate of Mary E. Gilstrap.

Williams filed suit against the Estate of Mary Gilstrap in the United States District Court for the District of Kansas on April 7, 1999. According to Gates, Williams did not respond to American Family's letter/offer of March 25, or send the documentation requested in the letter of February 11, prior to filing suit. American Family provided a defense in the action, hiring Coffeyville attorney M. Doug Bell to represent the estate. Bell reported to American Family that the estate was insolvent, because everything had passed in joint tenancy to the heirs.

After Rule 26 disclosures, Bell advised American Family that Williams had given sufficient evidence of loss that the insurer might consider an offer of policy limits in exchange for a complete release of the insured. Bell subsequently (on June 16) offered to settle the case for the policy limits.

Williams rejected the offer. Fitzpatrick wrote:

> Because American Family rejected three prior offers to settle within policy limits, my client is now contractually obligated to pay a contingent fee on her entire recovery. At that point, the decision was made to pursue her entire damages in the current civil lawsuit and seek recovery against the Estate of Mrs. Gilstrap and her liability carrier.

(Def. Exh. at A000046).

The Gilstrap Estate filed an offer of judgment in the amount of $100,000 on June 23, 1999.

On August 10, 1999, Williams proposed to settle with the estate by consent judgment in the amount of $350,000 and costs.

Under the proposed settlement, Williams would agree not to execute any portion of the judgment against the estate, in exchange for the estate's assignment of its rights under the American Family policy.

Bell recommended the proposed settlement to American Family as in the best interests of the insured, and American Family authorized him to proceed. American Family was not a party to the underlying lawsuit or settlement.

Gilstrap, through her legal representatives, assigned to Williams all her rights under the policy. A Journal Entry of Judgment was entered on September 24, 1999, in the amount of $350,000 and costs. The amount of $350,000 was requested and set by plaintiff's attorney, and not independently reviewed by the court. Following entry of judgment, American Family paid its limits of $100,000 and declined to pay the balance of the judgment.

In November, 1999, Williams filed the present action to recover the excess judgment against American Family, asserting a claim of negligence and bad faith, and claiming diversity jurisdiction.

### Conclusions of Law

As indicated above, American Family has raised a number of issues in its motion to dismiss. The court finds that these additional arguments do not justify dismissal. For example, American Family argues that the action should be dismissed due to incomplete diversity under U.S.C. § 1359, which provides that jurisdiction cannot be obtained by assignment

(Williams is a resident of Oklahoma but both American Family and the Gilstrap estate are residents of Kansas), if the assignment is improper or collusive. This argument, however, fails when American Family subsequently concedes that the assignment of the estate's claim to Williams "was not improperly or collusively made for the purpose of obtaining diversity jurisdiction." (Def. Br. at 12).

■ American Family also presents additional arguments that (1) an excess judgment claim is not appropriate because there was no prior adjudication of reasonableness of the settlement amount, and (2) because the estate did not face any excess judgment after there was no claim against the estate within six months of the accident (and Gilstrap's death) under KSA 56–2239(1). The court rejects both arguments. As to the first, under *Glenn v. Fleming*, 247 Kan. 296, 799 P.2d 79 (1990), there is a concern about collusive settlements, with the result that there is an "initial burden on the insured to make a prima facie case by producing evidence relating to good faith and reasonableness of the settlement." And it is true that there was no demonstration of reasonableness in the underlying litigation. However, the court believes American Family reads too broadly cases such as *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 934 P.2d 65 (1997), to the extent that it draws from the case an inference that the reasonableness of the settlement must have been established in the prior court proceedings.[1] Basically,

---

**1.** As to reasonableness of the underlying settlement, the Kansas Supreme Court has written:

Under the *Griggs* test adopted in *Glenn*, the plaintiff has the burden of initially presenting a prima facie case to establish the reasonableness of the settlement amount. We have not had occasion to provide guidance on the proof required to satisfy plaintiff's burden. However, the proof requires, at a minimum, enough information for the district court to make an independent evaluation of the reasonableness of the settlement. The test requires that plaintiffs do more than ask the district court to take on faith that the amount of the settlement is reasonable, even if negoti-

ated under the supervision of a federal magistrate. For example, affidavits with documentation could be offered to support the amounts of the claims. In a case of this size and complexity, independent expert testimony evaluating the strengths and weaknesses of the parties' positions could be presented. We give the district court flexibility. For guidance beyond factors suggested by the facts, we recommend those listed in *Chaussee [v. Maryland Casualty]*, 60 Wash.App. at 512, 803 P.2d 1339, for evaluating reasonableness:

" '[T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released

the parties take opposite positions: American Family thinks the reasonableness has to have been established in the earlier litigation; Williams argues (wrongly, it would appear from the evidence before the court) that it was. The court must reject both contentions. The reasonableness of the settlement amount was not established below, but this is not fatal to plaintiff's claim. This court can entertain evidence about the amount's reasonableness or lack thereof.

As to the second point, the court cannot but read KSA 56–2239(2) as permitting an excess claim if *either* there is a notice of claim within six months *or* if there is an action against the estate under KSA 58–2238, as there apparently was here.

The core, however, of American Family's argument is that there is simply insufficient evidence from which any fact finder could infer a breach of the duty to settle. Williams's first defense against this argument is the general argument that discovery has yet to be completed. Under the circumstances of the present case, this is not a bar to American Family's motion. While discovery has not been completed, two points stand out: first, Williams makes no attempt to show what, if any, evidence in particular she believes she may obtain which would corroborate the claim of bad faith. Second, American Family has disgorged its entire file relating to the underlying action, evidence which would be the primary basis for any assertion of an unreasonable failure to settle.

Turning to the merits of the case, in *Glenn v. Fleming*, 247 Kan. 296, 305–306, 799 P.2d 79 (1990), the court recognized an action against an insurer for lack of good faith in defending its insured.

> An insurance company may become liable for an amount in excess of its policy limits if it fails to act in good faith

and without negligence when defending and settling claims against its insured. When an insurer determines whether to accept or reject an offer of settlement, it must give at least the same consideration to the interests of its insured as it does to its own interests. *See Rector v. Husted*, 214 Kan. 230, Syl. ¶¶ 1, 2, 519 P.2d 634 (1974); *Bollinger v. Nuss*, 202 Kan. 326, 449 P.2d 502 (1969).

The question of an insurer's liability for an excess judgment depends upon the circumstances of the particular case and must be determined by taking into account the various factors present rather than on the basis of any general statement or definition.

The conduct of the insurer must not be viewed through hindsight. Instead, the offer and the strength of the plaintiff's case must be viewed as they fairly appeared to the insurer and its agents and attorneys at the time the offer was refused. *Rector*, 214 Kan. at 239, 519 P.2d 634; *Bollinger*, 202 Kan. at 341, 449 P.2d 502.

An insurance company acting honestly and in good faith upon adequate information should not be held liable because it failed to prophesy the result. Something more than mere error of judgment is necessary to constitute bad faith. *Bollinger*, 202 Kan. at 341, 449 P.2d 502.

The court also held that the insured's action for bad faith or negligent refusal to settle could be assigned by the insured. 247 Kan. at 314, 799 P.2d 79. The assignment could include a covenant not to execute against the tortfeasor/insured. 247 Kan. at 317–18, 799 P.2d 79. *See also Associated Wholesale Grocers*, 261 Kan. at 835, 934 P.2d 65 (covenant not to execute permissible if reasonable and in good faith). Such covenants must be viewed with caution: the court wrote that

---

person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case;

and the interests of the parties not being released.' " (Quoting *Glover v. Tacoma General Hosp.*, 98 Wash.2d 708, 717, 658 P.2d 1230 [1983] ).
261 Kan. at 841, 934 P.2d 65.

"[w]e do express concern over the reasonableness of assignment/covenants in which the amount of the judgment assigned has been determined by agreement of the parties [because] the settlement between the plaintiff and the insured may not represent an arm's length determination of the value of the plaintiff's claim." *Id.* at 318, 799 P.2d 79. However, the court concluded that the appropriate course was to permit the insurer to

> challenge the settlement in an action against the insurer to enforce the insurance contract [placing] the initial burden on the insured to make a prima facie case by producing evidence relating to good faith and reasonableness of the settlement. The ultimate burden of proving that the settlement was made in bad faith or that it was unreasonable would then rest with the insurer.

*Id.* at 318, 799 P.2d 79 (following *Griggs v. Bertram*, 88 N.J. 347, 367, 443 A.2d 163 (1982)). The court concluded, stating:

> Emphasis should be placed on the recognition that an insurer may avoid liability for bad faith by acting in good faith and, consequently, will sustain no excess judgment responsibility. The personal injury plaintiff or assignee will carry the burden of proof in proving to the trier of fact that the insurer exercised bad faith in refusing to settle within the policy limits.

Id. at 319, 799 P.2d 79.

■ The court finds that this is precisely the type of case where the insurer may avoid liability, since the evidence produced fails to demonstrate any bad faith or negligence on the part of the insurer. Here, the insured was killed in the accident, had essentially no assets or estate, and whose surviving spouse was disabled and uncommunicative. When the plaintiff opened an estate for the decedent, the defendant insurer provided a defense for the estate. Prior to the time the plaintiff instituted a state court claim against the decedent estate, the insurer offered a settlement of $81,000, or 81% of the policy limits. The insurer also requested documentation of various medical expenses. It is uncontroverted that this documentation was never provided to the insurer. Instead, plaintiff's first attorney made a counter-offer seeking compensation for some $96,000 in medical special expenses, less than the policy limits. Plaintiff now concedes that the amount contained in this communication was "mistaken." It is also uncontroverted that plaintiff's second attorney did not correct this mistake. The insurer renewed its offer of $81,000, stating that it felt the amount was fair, and that it would not offer the policy limits "at this time." The plaintiff responded by writing a "final offer" demanding the policy limits, and instituting suit when the insurer did not accept the offer.

Under the facts of the case, the court finds that the insurer's request for additional documentation was reasonable, and that in light of the failure of either of plaintiff's attorneys to respond to the request, and the failure of the second to correct what is concededly mistaken information supplied by the first attorney, the court should grant the motion for summary judgment. The plaintiff did not institute her state action because of the statute of limitations, which still had several months to run. At the time the action was instituted, the insurer (whose policy contained coverage limits of $100,000) had already offered $81,000 in settlement. Under these circumstances, the insurer did not breach any duty to its insured under Kansas law.

IT IS ACCORDINGLY ORDERED this 3d day of June, 2000, that the defendant's Motion to Dismiss (Dkt.No.12) is hereby granted.