**MID–CONTINENT LODGING AS-SOCIATES, INC., and George Shipman, Plaintiffs,**

**v.**

**The FIRST NATIONAL BANK OF CHICAGO, Bank of America National Trust and Savings Association, Trustee; and Federal Deposit Insurance Corporation, Defendants.**

**No. 96–1328–WEB.**

United States District Court,
D. Kansas.

March 12, 1998.

Roger Sherwood, Sherwood & Harper, Wichita, KS, James R. Schaefer, Wichita, KS, for Plaintiffs.

Jack C. Marvin, David E. Bengtson, Marc P. Clements, Morrison & Heckler L.L.P., Wichita, KS, for Defendants.

*Memorandum and Order*

WESLEY E. BROWN, Senior District Judge.

Plaintiffs filed this action for a declaratory judgment concerning the rights of the parties in a certain parcel of real property. The court's jurisdiction is proper under 28 U.S.C. § 1332. The matter is now before the court on the defendants' motion for summary judgment. The parties had an opportunity to present oral arguments at the motions hearing of March 2, 1998. The court is now prepared to rule.

*Summary Judgment.*

The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

*Undisputed Facts.*

For purposes of the motion for summary judgment, the court finds no genuine dispute as to the following facts.

1. The First National Bank of Chicago ("First Chicago") is a national banking association.

2. Bank of America National Trust and Savings Association, Trustee ("Bank of America") is a national trust and savings association.

3. The Federal Deposit Insurance Corporation ("FDIC") is a corporation established pursuant to the provisions of 12 U.S.C. § 1811. Pursuant to 12 U.S.C. § 1441a(m)(2), FDIC is the successor in interest to all claims, causes of action, and demands formerly owned and held by the Resolution Trust Company ("RTC"). Accordingly, the FDIC is entitled to enforce the terms and provisions of the Loan Documents and the Guaranty to the extent those documents are enforceable against the plaintiffs.

4. On March 15, 1984, Mid–Continent executed and delivered to First Federal Savings & Loan Association of Hot Springs, Arkansas ("First Federal"), a Promissory Note ("Note") in the original principal amount of $1,050,000.

5. To secure repayment of the Note, Mid–Continent executed and delivered to First Federal a Mortgage and Security Agreement ("Mortgage") granting a mortgage and security interest in favor of First Federal covering certain real estate and personal property, which is described in ¶ 7 of Defendants' Counterclaim and which is incorporated here by reference.

6. To further secure repayment of the Note, on March 15, 1984, Mid–Continent executed and delivered to First Federal an Assignment of Landlord's Interest in Leases ("Assignment"), in which Mid–Continent granted First Federal a collateral interest in all rents, profits, income, and other property.

7. The Mortgage and Assignment were properly recorded on March 16, 1984.

8. Plaintiff George A. Shipman executed and delivered to First Federal an unconditional guaranty of the indebtedness owed on the Note ("Guaranty") on March 15, 1984.

9. The Loan Documents (the Note, Mortgage and Assignment) were subsequently assigned to Landmark Savings Bank, F.S.B. ("Landmark"), as successor in interest to First Federal.

10. The RTC declared Landmark insolvent and was appointed as Landmark's Receiver.

11. As of July 1, 1992, the RTC, as Landmark's Receiver, assigned the Loan Documents to Bank of America, as trustee under a certain Pooling and Servicing Agreement dated July 1, 1992, for the RTC Commercial Mortgage Pass Through Certificate Series 1992–C5 (the "C5 Trust").

12. The document assigning the Loan Documents from the RTC to Bank of America was properly recorded.

13. First Chicago was appointed as the Master Servicer for the C5 Trust under the terms of the Pooling and Servicing Agreement.

14. On March 1, 1994, the Note matured and a balloon payment became due.

15. As a result of Mid–Continent's defaults, responsibility for servicing of the loan was transferred from First Chicago to E.Q. Services, Inc. ("EQS"), as Special Servicer under the terms of the Pooling and Servicing Agreement.

16. After the maturity of the Note, Plaintiffs and representatives from EQS entered into forbearance agreements to allow the parties to attempt to restructure the loan or to allow Mid–Continent to find alternative financing. In the forbearance agreements, Plaintiffs admitted that defaults had occurred:

B. One or more events of default as same are defined in the Loan Documents (the "Events of Default") has/have occurred under the Loan Documents.

C. Trustee has the right under the Loan Documents to proceed with any or all of its remedies under the Loan Documents, including, without limitation, (i) attempting to proceed or actually proceeding with foreclosure, … (iii) exercising any and all other rights and remedies available to Trustee under the Loan Documents. . . .

D. Notwithstanding the fact that the Loan is currently in default, Borrower has requested that Trustee temporarily forestall or postpone the further exercising of the Trustee's Remedies while Borrower attempts to cure the Events of Default. . . .

The forbearance agreements expired on May 1, 1995, and were not renewed.

17. Mid–Continent defaulted on the Note in the following ways, which include but are not limited to: a. Mid–Continent failed to make the balloon payment when it became due and when the forbearance agreements expired; b. Mid–Continent failed to pay ad valorem property taxes on the property for 1991, 1992, 1993, 1994, 1995, and 1996.

18. In the course of servicing the Loan, EQS caused an environmental assessment of the Property to be conducted.

19. The results of the environmental assessment revealed environmental contamination to the Property. According to the Phase I and II environmental reports, the alleged contamination is hydrocarbons and the al-

leged source of the contamination is an off-site underground storage tank.

20. The environmental contamination of the Property constituted a "disqualifying condition" in breach of the RTC's representations and warranties concerning the Loan, as set forth in the Pooling and Servicing Agreement. As a result of that breach, EQS requested that the RTC repurchase the loan from the C5 Trust.

21. Plaintiffs know of no private party or governmental entity that has requested, ordered, or demanded cleanup of the alleged contamination of the Property.

22. In July 1995, the RTC agreed to repurchase the Loan. In October 1995, the RTC repurchased the Loan. Plaintiffs attempt to controvert these facts by pointing out that no documents have been produced to establish the agreement, and by arguing that the deposition excerpts cited by defendants do not establish the existence or form of any such agreement. But the deposition testimony of Anne Ross and Kathleen Laird and the subsequent actions of the RTC in paying off the balance of the loan are sufficient to establish that there was an agreement that RTC would repurchase the loan from the C5 Trust. The record also shows without genuine dispute that it did so because the contamination of the Property was a disqualifying condition under the RTC's pooling and servicing agreement with the Trust.

23. Under normal business procedures, once the RTC accepts a request for repurchase, the RTC requires that the loan file and an assignment of the loan to the RTC be delivered to the designated successor loan servicer before the repurchase is paid by the RTC to the appropriate loan pool. With respect to the Mid–Continent Loan, the RTC funded the repurchase of the Loan to the C5 Trust before EQS transferred the original Loan file to the RTC. As a result of that variance in procedure, First Chicago erroneously treated the receipt of funds from the RTC as a payoff of the Loan. In fact, however, Mid–Continent was still indebted on the Note and the RTC intended its payment to First Chicago to constitute a repurchase of the Loan.

24. Based on the mistaken assumption that the Loan had been paid off, First Chicago erroneously marked the Note "paid," inadvertently and mistakenly released the Mortgage and Assignment, and returned the original Loan Documents held by Bank of America to Mid–Continent.

25. By letter dated January 17, 1996, First Chicago sent to Mid–Continent the Mortgage and Note marked as "paid."

26. Plaintiffs gave no consideration in exchange for the release.

Plaintiffs attempt to controvert the above paragraphs by asserting that "Anne Ross of EQS told George Shipman that they were getting out of the loan for environmental reasons. This led to Mr. Shipman's conclusion that the mortgage had been released and the note marked 'paid' for the same reason." Mr. Shipman's deposition testimony makes clear that he understood after talking with Ms. Ross that it was EQS that was "getting out of" the loan and that the loan was not being forgiven. *See* Def.Exh. A at 78 ("[S]he said ... they were no longer going to have the loan because of this EPA problem and it was going back to First Chicago."). It is perhaps understandable why Mr. Shipman made the assumption that the loan had been forgiven when he subsequently learned of the release of the mortgage and received the note marked "paid." But the evidence cited by the parties, including the deposition testimony of Anne Ross and Kathleen Laird, reveals no genuine factual dispute concerning the reason these documents were issued. The only reasonable inference on this record is that the documents were issued by First Chicago based upon a mistaken belief that the loan had been paid off rather than repurchased by the RTC.

27. The deed of release releasing the loan documents was recorded.

28. Upon learning of the mistaken release, First Chicago and Bank of America properly executed and recorded an Affidavit of Interest on June 5, 1996. This Affidavit of Interest notified all interested parties that Bank of America continues to hold a lien against the Property, that no consideration was given by Defendants in exchange for the mistaken release, and that any such release was null and void. The Affidavit of Interest

was executed by Bank of America and properly recorded on June 19, 1996.

29. Defendants have neither participated in the day-to-day operations of the hotel nor exercised control over the environmental compliance on the Property.

30. The Note and Guaranty, if enforceable, would entitle the FDIC a judgment against the plaintiffs for:

a. Unpaid principle balance on the Note of $924,339.49;

b. Accrued interest as of October 9, 1997, in the amount of $137,718.67;

c. Interest accruing from October 9, 1997, until paid, at the rate of 7.751%, or a daily rate of $199.01;

d. Default interest, late charges, and other amounts due under the Loan Documents, including but not limited to the costs of this action; and

e. Any additional monies advanced by Defendants for payment of insurance premiums, additional title search and abstracting costs, real estate taxes or other items in connection with the Property, so advanced, together with interest on the total amount of the judgment until paid.

31. The dispute is between citizens of different states and the amount in controversy exceeds the applicable jurisdictional minimum in 28 U.S.C. § 1332.

*Discussion.*

The plaintiffs initially sought a declaratory judgment as to two matters: first, the liabilities of the parties for clean-up costs associated with the contamination on the real property; and second, the respective interests of the parties after the release of the mortgage and the affidavits of interest filed by the defendants. Plaintiffs now concede there is no case or controversy as to the first matter. Doc. 36 at 13. Accordingly, the dispute concerns only the parties' respective interests in the real property. As to that issue, defendants have filed a counterclaim seeking judgment on the note and guaranty and seeking foreclosure of the mortgage on the property.

Defendants argue that the uncontroverted facts show the mortgage was released by mistake and that plaintiffs gave no consideration for the release. They argue that under such circumstances the mortgage, note,

and guaranty continue in full force and effect. *Citing Southern Kansas Farm v. Garrity,* 57 Kan. 805, 48 P. 33 (1897). Defendants now seek summary judgment on the claims for declaratory judgment and on their counterclaim. In response, plaintiffs first suggest that the defendants' release of the mortgage was intentional rather than inadvertent and that the defendants wanted out of the loan because of environmental concerns. Plaintiffs further argue that even if the release was issued by mistake, the doctrine of *Garrity* "has matured in the intervening one hundred years" and that the modern trend as shown in other jurisdictions "is to apply a doctrine of negligence to the acts of the mortgagee and, where the mortgagee is negligent in its handling of the mortgage documents and subsequent release, the mortgagee is not permitted to reinstate the mortgage." Pl.Resp. at 12 (*Citing Home Fed. Savings & Loan Assoc. v. Citizens Bank of Jonesboro,* 43 Ark.App. 99, 861 S.W.2d 321 (1993) and *Sunrise Savings & Loan Assoc. of Fla. v. Giannetti,* 524 So.2d 697 (Fla.App.1988)).

Plaintiffs' argument that the defendants released the mortgage intentionally in order to avoid environmental liability was dealt with by the court in its statement of facts. There simply can be no reasonable dispute on this record that the release was anything other than mistaken and inadvertent. Mr. Shipman's assumption that the release was issued for other reasons or his misunderstanding as to what Anne Ross meant by saying that EQS was "getting out of the loan" does not create a genuine issue of fact for a jury to decide.

■ As for plaintiffs' assertion that the defendants are bound by the release even if it was issued by mistake, that view is not supported by Kansas law. In *Garrity,* supra, the Kansas Supreme Court addressed a similar factual situation and concluded:

Neither is a release entered upon the records conclusive where payment is not made and it appears to have been done by accident or mistake. In such a case, equity will intervene and grant relief. The cancellation of the mortgage is to be regarded as only prima facie evidence of its

discharge, and the party asking relief may show that the release was made by fraud, accident, or mistake. When that is shown the mortgage will be held and enforced as a valid security. In this there are no intervening parties, and no questions as to what their rights might be can be raised. Under the testimony, there can be no doubt that, as between the parties themselves, the release is to be treated as a nullity, and that the plaintiff is entitled to a foreclosure of its mortgage.

*Garrity*, 57 Kan. at 808, 48 P. 33. *Garrity* is not an aberration; Kansas law has consistently recognized equitable relief from mistaken actions where the circumstances warrant doing so. *See e.g., North River Ins. Co. v. Aetna Finance Co.*, 186 Kan. 758, 352 P.2d 1060 (1960) (chattel mortgage released under mistake of fact could be reinstated); *Conner v. Koch Oil Co.*, 245 Kan. 250, 777 P.2d 821 (1989) (reformation appropriate to reform releases of oil and gas leases); *Harper v. Continental Oil Co.*, 805 F.2d 929 (10th Cir.1986) (reformation available where transfer of lease was due to mistake). There are circumstances where equitable relief might be inappropriate, such as where the rights of innocent third parties are concerned or where a party has reasonably relied to his detriment on the mistaken release. But no such circumstances are asserted here.

The uncontroverted evidence shows that the release of the mortgage and the cancellation of the note were mistaken and inadvertent. Plaintiffs provided no consideration for these actions and do not claim to have changed their position in reliance upon them. The balance of the note remains unpaid and plaintiffs are in default under the terms of the note. Under these circumstances, equity requires the court to declare that, notwithstanding the mistaken release of the Loan Documents, the Note, Guaranty, and Mortgage remain valid and enforceable and the defendants hold a valid promissory note and mortgage against the Real Property. Moreover, the FDIC is entitled to judgment on

the Promissory Note as prayed for in its counterclaim, and for a judgment foreclosing FDIC's mortgage lien, security interest and assignment of leases against the Mortgaged Property, and for sale of the Mortgaged Property according to law, as prayed for in its counterclaim.

 The court concludes that the judgment in favor of FDIC should not include recovery of its attorneys' fees. FDIC argues that recovery of such fees is appropriate under the terms of the mortgage and by virtue of the retroactive application of K.S.A. § 58–2312.[1] (*Citing Benedictine College, Inc. v. Century Office Prod., Inc.*, 868 F.Supp. 1239, 1242 (D.Kan.1994)). But as Judge Lungstrom noted in *Baxter State Bank v. Bernhardt*, 985 F.Supp. 1259 (D.Kan.1997), the Kansas Court of Appeals recently held that § 58–2312 applies only prospectively and does not authorize attorney fees under a document signed before 1994. *See Ryco Packaging Corp. v. Chapelle Int'l.*, 23 Kan.App.2d 30, 926 P.2d 669 (1996), *rev. denied*, (Kan. Feb. 4, 1997). Accordingly, the FDIC is not entitled to recover attorneys fees under the mortgage. Similarly, the FDIC is not entitled to attorney fees under the Guaranty despite the fact the Guaranty states it is governed by Oklahoma law, pursuant to which attorney fees were (and are) recoverable. *See* Okla. Stat. tit. 15, § 276. In *Young v. Nave*, 135 Kan. 23, 10 P.2d 23 (1932), the Kansas Supreme Court found that an attorney fee provision in a note governed by Indiana law (where such provisions were lawful) was "inimical to the public policy of this state, and in a suit on the contract the provision must be severed and disregarded." *Id.* at 24, 10 P.2d 23. Although the public policy expressed in § 58–2312 has changed since the parties signed the Guaranty agreement, *Ryco* makes clear that the change is to be applied prospectively only, and the court concludes that *Ryco* pre-

---

1. K.S.A. § 58–2312 was amended in 1994 to provide in part that "any note, mortgage or other credit agreement may provide for the payment of reasonable costs of collection, including, ... attorney fees...." Prior to the 1994 amendment, it stated just the opposite, providing in part that "[I]t shall be unlawful for any person ... to

contract for the payment of attorney's fees in any note, ... or mortgage; and any such ... stipulation ... shall be null and void; and that hereafter no court in this state shall render any judgment, order or decree by which any attorney's fees shall be allowed ... to the maker of any promissory note ... [or] mortgage...."

cludes recovery of attorney fees under these circumstances.

*Conclusion.*

Defendants' Motion for Summary Judgment (Doc. 33) is GRANTED. Defendants shall prepare, circulate, and submit an appropriate form of judgment for the court's approval. IT IS SO ORDERED this 12th day of March, 1998, at Wichita, Ks.